# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DYNAMIC INDUSTRIES, INC., DYNAMIC INDUSTRIES INTERNATIONAL, LLC and DYNAMIC INDUSTRIES SAUDI ARABIA, LTD.**<br><br>**VERSUS**<br><br>**METLIFE - AMERICAN INTERNATIONAL GROUP - ARAB NATIONAL BANK COOPERATIVE INSURANCE COMPANY; ET AL.** | **CIVIL ACTION NO. 2:21-cv-748**<br><br>**JUDGE IVAN L.R. LEMELLE**<br><br>**MAGISTRATE JUDGE JANIS VAN MEERVELD** |

## OPPOSITION TO MOTION TO DISMISS (R. DOC. 22) AND SUPPLEMENTAL MEMORANDUM (R. DOC. 56) FILED BY MARSH & MCLENNAN COMPANIES, INC.

Dynamic Industries, Inc. ("DI"), Dynamic Industries International, LLC ("DII") and Dynamic Industries Saudi Arabia, Ltd. ("DISA") (collectively, "Plaintiffs"), who respectfully submit this Opposition to the Motion to Dismiss and Supplemental Memorandum (R. Docs. 22, 56) filed by Defendant Marsh & McLennan Companies, Inc., d/b/a/ Marsh Inc. ("Marsh"). Marsh's Motion seeks dismissal of all claims against it, but fails to address proper legal standards, ignores numerous relevant paragraphs of the First Amended Complaint for Declaratory Relief and Damages ("First Amended Complaint") (R. Doc. 35) and improperly attempts to raise factual disputes at the Rule 12 stage. For these reasons, the Motion should be denied.

## FACTUAL BACKGROUND[1]

Plaintiffs seek coverage under a comprehensive general liability policy of insurance – issued by some of the named Defendants – for an offshore demolition accident that occurred in the

---

[1] Plaintiffs acknowledge that they provide a number of additional facts in support of the allegations in the First Amended Complaint. Plaintiffs attempted to plead a short, concise summary of these facts by noting the facts that the Policy was allegedly placed in 2017, the claim occurred in September of 2019, and the Policy was, in fact, not issued until after the claim. Due to the numerous factual assertions made by the moving Defendants which are contrary

Berri Field in Saudi Arabia. This Policy was issued and delivered to Plaintiffs in Louisiana, not Saudi Arabia, and Defendant Marsh played a role in that delivery.

## I.    The Contract and the Policy

In 2015, DISA and Saudi Arabian Oil Company ("SAUDI ARAMCO") entered into a contract for procurement and construction, and, in 2016, a contract purchase order (collectively, the "Contract") to procure, fabricate, load-out, transport, demolish, replace install, test and pre-commission five (5) replacement pipelines and associated topside scraping facilities located in the Berri oil field in the Kingdom of Saudi Arabia (the "Project"). (R. Doc. 35, ¶ 15). Performance of the Contract by DISA was guaranteed by DI through a Parent Company Performance Guarantee, rendering DI directly liable for the obligations of DISA under the Contract. (*Id.* at ¶ 16). The Contract contains a clause obligating DISA to SAUDI ARAMCO for certain property damage caused by DISA or *any of its subcontractors (at any tier)* and fully responsible to SAUDI ARAMCO for the acts and omissions of *all of its subcontractors*. (*Id.* at ¶ 17).

Plaintiffs initiated the process of obtaining insurance on behalf of all three Dynamic-related companies for operations under the Contract. (Declaration of M. Mahfouz at ¶ 5, attached hereto as Exhibit A). The Dynamic companies utilized the brokerage services of Marsh, through its subsidiary Marsh USA, Inc. D/B/A MARSH USA RISK SERVICES ("Marsh USA"), in order to procure an adequate insurance policy under the Contract, insuring all of the Dynamic companies. (Exh. A at ¶¶ 5-6). Through the coordinated efforts of Marsh, Marsh USA and Marsh KSA,[2] Plaintiffs were told by the Marsh entities that a comprehensive general liability policy of insurance (the "Policy") from MetLife American International Group and the Arab National Bank

---

to, or at least inconsistent with, the actual dealings between the parties hereto, Plaintiffs are compelled to provide additional facts for the Court's consideration of the pending motions.

[2] Marsh Saudi Arabia Insurance & Reinsurance Brokers Saudi Arabia Riyadh.

Cooperative Insurance Company ("MetLife-AIG-ANB" or "MAA") had been obtained. (*See* Exh. A at ¶ 7). Marsh informed Plaintiffs that it had provided the required insurance coverage to cover the Dynamic entities at all relevant times during the Project. (*Id.*) Marsh USA understood, through discussion with Plaintiffs, that Plaintiffs wished to procure all necessary *primary* insurance to protect them as required under the Contract. (R. Doc. 35 at ¶ 20).

While the Policy was supposed to be procured in January 2017 by and through Marsh, through its subsidiary Marsh USA, in New Orleans, Louisiana, with Plaintiffs utilizing the insurance services and expertise of Marsh and/or Marsh USA to acquire the necessary coverage as required by the Contract, this, in fact, did not occur. (*See* Exh. A at ¶ 14; Exh. A-4). On January 20, 2017, **DI** issued its "Insurance Placement" letter to Marsh USA, Inc., with **DI**'s EVP and Chief Financial Officer executing the letter on Dynamic letterhead and DI's New Orleans address. (*See* Exh. A at ¶ 9; Exh. A-1). Regardless, Plaintiffs relied upon, and indeed paid for, the expertise and recommendations of Marsh USA and/or Marsh to procure the necessary insurance protecting Plaintiffs from any loss as required under the Contract. (*See* R. Doc. 35 at ¶ 19; Exh. A at ¶¶ 9-11). For the services provided by "Marsh," Dynamic Energy Service International LLC, the parent company of DI, paid Marsh at least $25,000 for brokerage services. (*See* Exh. A-3). Additionally, the premium for the Policy was invoiced to Plaintiff DISA on April 7, 2017 and paid on September 9, 2017. (*See* Exh. A-4). In 2017, no Marsh entity ever requested a Broker of Record, Broker Letter of Letter Authorization, Proposal Form or any similar document from any of the Plaintiffs. (*See* Exh. A at ¶ 14). On or about February 02, 2017, MAA provided the Dynamic entities via email to New Orleans with a Certificate of Insurance identifying the name and address of the Insured as "Dynamic Industries International LLC, 10777 Westheimer Rd Suite 975 USA". (Exh. A-2).

Although the Policy was supposed to be issued for the period January 12, 2017 to January 11, 2021, no actual policy was ever delivered to Plaintiffs until November of 2019, *after the loss in question*. (*See* Exh. A-5). Marsh KSA, acting as an agent of the insurer, did not provide Plaintiffs with the actual, written Policy until November 19, 2019. (R. Doc. 35, ¶ 75; *see also* Exh. A-5).

## II. The Incident

On June 25, 2019, while performing work on the Project, a subcontractor of DISA damaged a submarine power cable owned by SAUDI ARAMCO (the "Incident"). (R. Doc. 35 at ¶ 23). This discovery was reported to DISA on or about September 7, 2019. (*Id.* at ¶ 36). SAUDI ARAMCO's formal investigation into the cause of the damage ultimately revealed that the damage to the cable was occasioned during the demolition operation in connection with the Project and pursuant to the Contract. (*Id.* at ¶ 28). DISA received formal notice of this discovery on March 24, 2020, at which time SAUDI ARAMCO requested that DISA, and by extension DI, rectify the damage pursuant to the express terms of the Contract and implement temporary repair solutions by April 30, 2020 in order to allow for installation of a new cable by March of 2021. (*Id.* at ¶ 29). On April 7, 2020, SAUDI ARAMCO reiterated its request that DISA submit an action plan for the temporary solution and permanent replacement of the damaged cable, noting its criticality to SAUDI ARAMCO's other operations. (*Id.* at ¶ 31).

## III. The Merger

Around the time of the discovery of the damaged submarine power cable, the insurer to Plaintiffs' Policy, MAA, allegedly commenced discussions about a potential merger deal with Walaa Cooperative Insurance Company ("Walaa"). On September 29, 2019, after the Plaintiffs' Policy was supposedly procured by Marsh with MAA as the underwriting concern, but before the Policy was ever actually "issued and delivered" to Plaintiffs, MAA and Walaa executed a merger agreement (the Merger"). Under the terms of this merger, Walaa fully absorbed MAA and

purportedly assumed full responsibility for all of MAA's liabilities. Based on the allegations in the Complaint, the Declaration of Syed Siddiq (R. Doc. 44-4) and the terms of the only document provided by the involved parties, there was no policy "issued" as of the merger and none of the Defendants have provided unequivocal evidence that the Policy – a liability issued under the authority of MAA as the underwriting concern – was actually issued by Walaa or assumed by Walaa.

When the Policy was finally issued and delivered on November 14, 2019, the Policy listed MAA as the insurer, despite the fact that MAA was allegedly absorbed by Walaa under the terms of the Merger. (*See* Exh. A-5). In fact, at no time until the claim was denied was a representative of Plaintiffs ever aware that Walaa identified itself as the underwriter of the Policy. (*See* Exh. A at ¶ 34). Because the Policy was delivered on MAA's letterhead after the merger, Plaintiffs are unclear as to whether the Policy was a liability that was absorbed by Walaa under the terms of the merger. As a result, Plaintiffs have sued both MAA and its purported successor in interest Walaa, as well as American Life Insurance Company ("ALICO") and AIG MEA Investments and Services Company ("AIG MEA"), two domestic companies that owned MAA at the time the policy of insurance in question was issued and may have successor liability for MAA's obligations.[3]

## IV. The Claim

Because Plaintiffs have direct contractual liability to SAUDI ARAMCO and its affiliates for certain property damage under the terms of the Contract, in the Fall of 2019 Plaintiffs sought primary insurance coverage under the Policy issued by MAA. Acting from New Orleans, Louisiana, a Dynamic representative contacted Marsh's New Orleans office to notify Marsh of the loss. (*See* Exh. A-6). In turn, the local Marsh representative located in the New Orleans office –

---

[3] Plaintiffs have since dismissed ALICO and AIG MEA under Rule 41(a)(1)(A)(i), without prejudice.

Theresa Bonin – contacted her Marsh counterpart in Saudi Arabia to provide notification of the loss on behalf of "Dynamic." (*Id*. at p. 10). Notably, in that transmission, the Marsh representative stated: "In reviewing our files and emails we cannot locate a copy of the **MetLife AIG ANB Cooperative Insurance Company** policy, although we do have copies of the reinsurance totaling 87.5%." (*Id.*) The Marsh representative closed by asking for a copy of the Policy and "that your email of January 17, 2017 [over two and a half years earlier] advised that 'In terms of claims, the local insurer will follow lead reinsurer's decision.'" (*Id.*) Dynamic's General Counsel responded to this email with known details of the claim. (Exh. A-6 at p. 9).

The recipient of this first notice – a Marsh KSA employee[4] – responded noting that Marsh would notify the "lead reinsurer ***Chubb Dubai*** for a potential insurance claim." (*Id.* at 8 (emphasis added)). This communication was between the local Marsh representatives (Bonin and Laborde), Dynamic's General Counsel (Mark Mahfouz) and Marsh KSA's office. Bonin – acting as Marsh USA – responded reiterating the need for the "local policy today." (*Id.*) The "Marsh" representative responded concerning the Chubb policy, to which Bonin asked "***[w]hy was the MetLife AIG ANB Cooperative Insurance Company policy not issued?***" (*See id.* at 7). She further commented: "The reinsurance policies do not provide 100% - only 87.5%. The certificate shows policy number 'TBA'. It seems important to us to have the actual policy and a policy number." (*See id.*)

After several email communications concerning the lack of provision of any policy among the Marsh employees, all of which included Dynamic's general counsel in New Orleans, on October 30, 2019, Plaintiffs requested an update on when it could expect delivery of the Policy. (*Id.* at p. 1). On November 4, 2019, Marsh responded as follows:

> There have been discussions with the ANB MetLife on the policy document issuance. **The file has been reviewed by their reinsurance manager and as of**

---

[4] Vivek.Parkash@marsh.com.

**this week the main direct insurance underwriter has been asked to list out his requirements that will enable him to issue the policy wordings**.

(Exh. A-7 at p. 3 (emphasis added)). One day later, the Marsh KSA representative advised that there was a "contentious" meeting in Riyadh with ANB (one of the members of the MetLife AIG ANB Cooperative), who initially *rejected* issuing a policy. (Exh. A-8 at p. 1). This rejection was allegedly based on the "non-submission" of regulatory documents. One of these documents was the BOR, or Broker of Record, letter, which is noted in the Declaration of Syed Siddiq (R. Doc. 44-4). On November 5, 2019, Marsh KSA forwarded to Dynamic a number of documents that were represented as required by ANB, the basis on which ANB would issue the Policy. (*See* Exh. A-8). Included within these documents was the "underwriting information" that the insurers had received. The underwriting information contained email communications from Dynamic representatives about the Project and identified Dynamic Industries, Inc. (Exh. A-8 at pp. 10-33).

Marsh subsequently requested the help of both Dynamic in New Orleans **and** Marsh in New Orleans in order to obtain issuance of the Policy. (*See* Exh. A at ¶ 24). In order to issue the Policy, Marsh requested – from New Orleans – the back-dated execution of two documents: (1) a Broker's Letter Authorization ("BLA"); and (2) a Proposal Form from MAA.[5] (*See* Exh. A-7 at p. 2). Marsh also noted the "underwriting information" for the project, a .zip file that includes various communications form the Plaintiffs. (*See* Exh. A-8). With respect to the Proposal Form, Bonin responded on November 6, 2019 as follows: "With respect to the Proposal Form, ANB issued the attached COI confirming that they were on risk as of 12 January 2017 and your email of 26 January 2017, copy attached, also confirmed 100% cover placed. The client should not need to submit any additional information at this time." (Exh. A-7 at p. 1).

---

[5] At no time prior to November of 2019 were Plaintiffs ever advised by Marsh or MAA that a BLA or Proposal Form was required to issue the Policy. (*See* Exh. A at ¶ 26).

The Marsh representative replied that required submission of the Proposal Form *after* the loss was "inflexible" and deemed a regulatory requirement by ANB prior to issuance of a policy. (*Id.*) On November 6, 2019, Dynamic's general counsel, from New Orleans, sent Marsh the signed BLA on behalf of DISA. (Exh. A at ¶ 29; A-9). No such letter was ever requested on behalf of DII or DI. (Exh. A at ¶ 29). The BLA was signed by DISA in November of 2019, despite it being back dated January 1, 2017 as demanded by Marsh and/or ANB and/or the underwriters for the Policy. (Exh. A at ¶¶ 28-29). Marsh USA was a copy recipient of the BLA. (Exh. A-9 at pp. 6-7).

On November 8, 2019, Marsh, acting for the insurers, advised that Plaintiffs would have to back date the Proposal Form to December of 2016 or a date in January of 2017 to "factually align with the information submitted by Dynamic to Marsh and by Marsh to the insurer at that time." (Exh. A-10 at p. 1). The Proposal Form was then signed by Dynamic and sent by Dynamic – from its New Orleans offices – for delivery to the underwriters, which Marsh confirmed was "submitted to the insurance company." (Exh. A-11 at p. 1). Thereafter, on November 14, 2019, the Policy was electronically mailed to Plaintiffs by Marsh on behalf of the insurers, and also mailed in hard copy to Dynamic and received by Dynamic in New Orleans, Louisiana.[6] (Exh. A at ¶ 35).

In the BLA dated January 1, 2017, Plaintiff DISA exclusively appointed Marsh KSA to *communicate* on DISA's behalf with any insurance company located in Saudi Arabia. (*See* Exh. A-9 at pp. 6-7). Importantly, while the appointment certainly authorized Marsh KSA to initiate communications regarding the procurement of any insurance policy, it did not authorize Marsh KSA to procure any insurance policy or take delivery of any policy, either on DISA's behalf or

---

[6] In fact, Plaintiffs have no record of the Policy ever having been delivered by anyone to any Dynamic entity, including DISA, in Saudi Arabia. (Exh. A at ¶ 35).

the other Plaintiffs. Rather, the actual procurement of an insurance policy was the responsibility of Marsh, and the delivery of the policy was the responsibility of the insurer. The Policy was never delivered to any Dynamic entity in Saudi Arabia. (Exh. A at ¶ 36). The Policy was formally issued as of November 14, 2019, after the Merger. It bears the official company stamp of MAA.

## V.    The Denial

After multiple telephone conferences between Plaintiffs and counsel for MAA, MAA denied coverage under the Policy via an email dated September 28, 2020. (*See* Exh. A-13). Upon receipt of denial, Plaintiffs contacted their broker Marsh, through its subsidiary Marsh USA, for assistance in appealing the denial of Plaintiffs' claim under the Policy. (*See* Exh. A-14). Thereafter, Marsh USA initiated discussions with Marsh KSA to facilitate such conversations between Marsh USA and the claims manager responsible for reevaluating the Plaintiffs' claim under the Policy. (*See* Exh. A-15). Marsh KSA obtained and provided the contact information for the MAA claim manager of the Policy, and Plaintiffs contacted the claim manager shortly thereafter. (*See* Exh. A-16). After the MAA claim manager failed to provide a substantive response to multiple emails regarding coverage, Plaintiffs sent one final demand letter requesting coverage under the Policy on February 12, 2021. (*See* Exh. A-17). MAA denied coverage, so the claim is now ripe for review.

## LAW AND ARGUMENT

## I.    This Court Has Subject Matter Jurisdiction

Marsh first seeks to dismiss the Amended Complaint based on a lack of subject matter jurisdiction. "A motion to dismiss for lack of subject-matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief." *Sureshot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 754 F. App'x 235, 239 (5th Cir. 2018) (citing *Wagstaff v. U.S. Dep't of Educ.*, 509 F.3d 661, 663 (5th Cir. 2007)).

As an initial matter, the argument raised by Marsh with respect to this Court's admiralty jurisdiction is moot, as Plaintiffs have asserted an additional basis for subject matter jurisdiction in their First Amended Complaint – diversity of citizenship jurisdiction. (R. Doc. 35 at ¶ 12). Indeed, the diversity statute generally provides for federal jurisdiction over suits involving foreign citizens or subjects in two scenarios. First, the statute contemplates federal jurisdiction over a lawsuit where the amount in controversy exceeds $75,000 and the suit is between citizens of an American state and citizens or subjects of a foreign state. 28 U.S.C. § 1332(a)(2). The diversity statute also expressly provides for jurisdiction where the amount in controversy exceeds $75,000 and the suit is between citizens of states and in which citizens or subjects of a foreign state are additional parties. 28 U.S.C. § 1332(a)(3).

In this latter scenario, section 1332(a)(3) provides a federal court with jurisdiction where the domestic parties on opposite sides of the case are diverse. Moreover, the diverse domestic parties need not be the principal adversaries in the suit. As long as the diverse domestic parties have a *legitimate* dispute, section 1332(a)(3) confers jurisdiction even when the main suit involves one or more alien parties. It is irrelevant for diversity purposes that the aliens on both sides of the dispute come from the same country. *See, e.g., Tango Music, LLC v. Deadquick Music, Inc.,* 348 F.3d 244, 245–246 (7th Cir. 2003) (statute does not say ". . . citizens or subjects of different foreign states," and court could not think of reason to depart from literal reading); *Bank of New York v. Bank of America*, 861 F. Supp. 225, 229 (S.D.N.Y. 1994) (aliens on opposite sides of an action hail from the same country has no bearing on the existence of diversity under § 1332(a)(3)); *Clark v. Yellow Freight Sys., Inc.*, 715 F. Supp. 1377, 1378 (E.D. Mich. 1989) (jurisdiction exists under § 1332(a)(3) even though one plaintiff and one defendant were Canadian citizens, where there was a legitimate dispute between a Michigan corporation and an Indiana corporation); *Zenith Elec.*

*Corp. v. Kimball Intern. Mfg., Inc.*, 114 F. Supp. 2d 764, 771 (N.D. Ill. 2000) (jurisdiction existed where the domestic parties on opposite sides of the cases were diverse even though citizens of Mexico were also present on both sides of the case). Therefore, the presence of aliens on opposite sides of an action, even if they are citizens of the same foreign country, does not destroy diversity jurisdiction where the domestic parties are diverse. *Allendale Mutual Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 428 (7th Cir. 1993); *Transure, Inc. v. Marsh & McLennan, Inc.*, 766 F.2d 1297, 1299 (9th Cir. 1985). Article III of the Constitution requires only minimal diversity. *State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 531 (1967); *see also Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 492 n.18 (1983).

Here, this Court has subject matter jurisdiction under section 1332(a)(3), as the amount in controversy exceeds $ 75,000, the suit is between citizens of different states and citizens or subjects of a foreign state are additional parties. The Plaintiffs include two Louisiana citizens and one Saudi Arabian citizen. Likewise, the Defendants include two Delaware and New York citizens and two Saudi Arabian citizens. As stated above, because the domestic parties are completely diverse and have a legitimate dispute, the presence of foreign parties on opposite sides of the action does not destroy diversity. While Marsh does not appear to challenge the amount in controversy or citizenship of the domestic or foreign parties, it maintains that federal jurisdiction cannot be conferred under Section 1332(a)(3) because the domestic parties do not have a "legitimate" dispute. According to Marsh, there is no legitimate dispute between the domestic parties because the principal dispute is between the additional foreign parties.

This argument does not pass muster, either factually or legally. First, the dispute between the Marsh defendants and Plaintiffs is "legitimate." The actions or inactions of Marsh between 2017 (when the Policy was supposed to be placed) and November of 2019, when the Policy was

actually delivered, bear directly on this dispute. Further, there is no requirement that the diverse domestic citizens be *principal* adversaries, only that they be *legitimate* adversaries. *Dresser Indus. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 500 (3d Cir. 1997); *see also* 15A Moore's Federal Practice - Civil § 102.71 (2021). In *Dresser*, the defendant (London Market Insurers) argued that the addition of a domestic insurer holding 0.564% of the policy was not "legitimate" because the London Market Insurers were the principal parties. The court rejected this argument, stating that so long as there is a "legitimate" dispute between the citizens involved, jurisdiction under 28 U.S.C. § 1332(a)(3) exists. The court noted that the term "additional" does not reference the level of involvement of the parties or the interests at stake; rather, all that is required is a legitimate controversy between diverse citizens. *Id.* at 500.

Here, the domestic Plaintiffs DI and DII clearly have a legitimate dispute with the domestic Defendants Marsh and Marsh USA as the agents and/or brokers to the insurance policy at issue. By way of example, the Plaintiffs, which include two Louisiana citizens, seek to recover from Marsh, a Delaware and New York citizen, based on the assertion that Marsh procured an excess insurance policy when it should have procured a primary insurance policy. The failure to procure an adequate insurance policy is clearly a legitimate dispute, providing this Court jurisdiction under section 1332(a)(3). For these reasons, Marsh's Motion to Dismiss based on a lack of subject matter jurisdiction should be denied.

## II.     This Court Has Personal Jurisdiction Over Marsh

Marsh also seeks to dismiss the suit for lack of personal jurisdiction. Rule 12(b)(2) of the Federal Rules of Civil Procedure permits dismissal of a suit for lack of personal jurisdiction.

### A.  Legal Standard

Where a defendant challenges personal jurisdiction, the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists. *Luv N'Care, Ltd. v. Insta-Mix, Inc.,*

438 F.3d 465,469 (5th Cir. 2006). The plaintiff need not, however, establish jurisdiction by a preponderance of the evidence; a *prima facie* showing suffices. *Id.*; *see also D.J. Investments, Inc. v. Metzler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545-46 (5th Cir. 1985). The court must accept the plaintiff's uncontroverted allegations, and resolve all conflicts between the facts contained in the parties' affidavits and other documentation in favor of jurisdiction. *Long v. Patton Hosp. Mgmt., LLC*, No. 15-2213, 2016 U.S. Dist. LEXIS 23825 (E.D. La. Feb. 26, 2016).

"In a diversity action, federal court jurisdiction over a nonresident defendant extends only to the limits permitted by the long-arm statute of the forum state." *Quasha v. Shale Dev. Corp.*, 667 F.2d 483, 485-486 (5th Cir. 1982) (citations omitted). The limits of the Louisiana Long-Arm Statute are coextensive with constitutional due process limits, and, accordingly, the sole inquiry into jurisdiction over a nonresident is whether it comports with constitutional due process requirements. *Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 242-43 (5th Cir. 2008) (citing *A&L Energy, Inc. v. Pegasus Group*, 791 So.2d 1266, 1270 (La. 2001)); La. R.S. 13:3201(B) ("a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States"). "The Louisiana Long-Arm Statute is to be interpreted liberally in favor of finding jurisdiction . . . and is to extend to the full limits of due process under the fourteenth amendment." *Quasha*, 667 F.2d at 486 (citations omitted). Accordingly, to determine whether personal jurisdiction exists over Marsh, a due process inquiry is all that is necessary.

"To comport with due process requirements in asserting in personam jurisdiction, a nonresident defendant must have certain 'minimum contacts' with the forum state 'such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts

are satisfied either through contacts sufficient to assert specific jurisdiction, or contacts sufficient to assert general jurisdiction. *Id.*

Specific jurisdiction exists when an action arises out of a defendant's contacts with the forum and a relationship among the defendant, the forum and the litigation is the essential foundation of *in personam* jurisdiction. *Shaffer v. Heitner*, 433 U.S. 184, 204 (1977); *DeReyes v. Marine Mgmt. & Consulting, Ltd.*, 586 So. 2d 103, 105 (La. 1991). The minimum contacts test may be satisfied by a single act or action by which the defendant purposefully avails itself of the forum state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). In examining whether specific jurisdiction exists, a court will inquire into (1) "whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposely availed itself of the privilege of conducting activities there," (2) "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts," and (3) "whether the exercise of personal jurisdiction is fair and reasonable." *Cooper v. Faith Shipping*, No. 06-892, 2010 U.S. Dist. LEXIS 56780 (E.D. La. June 9, 2010). The "minimum contacts" requirement can be satisfied by a single act if the non-resident defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *see also Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990) ("It is well settled that specific jurisdiction may arise without the nonresident defendant's ever stepping foot upon the forum state's soil…."); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957) (a nonresident defendant need have only one contact with the forum, so long as the contact is meaningful). "'[M]inimum contacts'" is not necessarily a numbers game; a single contract can fill the bill." *Pritzer v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994) (*citing McGee*, 355 U.S. at 223).

Once sufficient minimum contacts are found to exist for purposes of the due process analysis, the inquiry then turns to whether exercising jurisdiction would offend traditional notions of fair play and substantial justice. *Asahi Metal Indus. Corp. v. Superior Court*, 480 U.S. 102, 113 (1987). The burden is on the party opposing jurisdiction to show a "**compelling** case that the presence of some other considerations would render jurisdiction unreasonable." *Hagan v. Stone*, No. 32,280 (La. App. 2 Cir. 9/22/99); 742 So. 2d 101 (emphasis added). As shown below, sufficient minimum contacts exist such that Marsh USA and Marsh are subject to personal jurisdiction in Louisiana and there is no **compelling** reason that would render the exercise of jurisdiction unreasonable.

**B. Marsh's Subsidiary, Marsh USA, Has Sufficient Minimum Contacts With Louisiana To Confer Specific Jurisdiction.**

Marsh makes unfounded allegations that it does not have sufficient forum-related contacts with Louisiana and, therefore, it cannot be subjected to the jurisdiction of this Court. R. Doc. 56 at 9. This argument entirely ignores the First Amended Complaint's allegations regarding the procurement and issuance of the Policy in the forum state. By way of example, Plaintiffs, two of whom are Louisiana subjects, utilized the brokerage services of Marsh USA, a subsidiary of Marsh that is registered to do business in Louisiana, in order to procure an adequate insurance policy under the Contract. *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 418-19 (5th Cir. 1993) ("A single act by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted."). Marsh USA coordinated with Marsh KSA, its Middle Eastern counterpart and another member of the Marsh family, in order to procure the Policy, and this coordination and effort was accomplished because these two companies share a common owner. Marsh USA also received payment for its procurement of the

Policy, as did Marsh KSA through the premium for the Policy, which revenue flowed to the parent, Marsh. (R. Doc. 56-1 at pp. 45-48).

After Plaintiffs' claim for coverage under the Policy was denied, the Plaintiffs contacted Marsh USA for assistance in appealing the denial. Thereafter, Marsh USA initiated discussions with Marsh KSA to facilitate such conversations between Marsh USA and the claims manager responsible for reevaluating the Plaintiffs' claim under the Policy. Marsh USA was copied on multiple emails between Marsh KSA and counsel for MAA discussing the Plaintiffs' Policy. All of these communications occurred with Dynamic in New Orleans, the local Marsh USA office, and the Marsh KSA representative. Again, the interrelationship of the two Marsh subsidiaries is crucial to the alter ego issue. The Policy was then issued and delivered to Plaintiffs, two of whom were and are Louisiana subjects, in Louisiana. Because this litigation arises directly from these forum-related contacts, Plaintiffs have made a *prima facie* showing that sufficient minimum contacts exist over Marsh USA and, by extension, Marsh.

All of this is further underscored by Marsh USA's Managing Director's statements when discussing the renewal of the Policy. That communication exemplifies the unified approach of the various Marsh entities in providing its "global professional services."[7] The Managing Director states: "I am also following up on our conversations from a few weeks ago reading our local office's compensation. Considering the claims follow up and ***our continued engagement*** on the policy placed by ***our Dubai offices***, we propose an annual fee of $35,000." (Exh. A-18). Clearly, the Managing Director of Marsh USA was using the collective "our" to describe the efforts of both Marsh subsidiaries in procuring this Policy.

---

[7] "The Risk and Insurance Services segment provides risk management solutions, services, advice and insurance broking, reinsurance broking and insurance program management services for businesses, public entities, insurance companies, associations, professional services organizations, and private clients. The Company conducts business in this segment through Marsh and Guy Carpenter." (R. Doc. 56-1 at p. 69).

C. **Exercise of Specific Jurisdiction Over Marsh USA Does Not Offend Traditional Notions of Fair Play and Substantial Justice**

Under the due process inquiry, "[e]ven if minimum contacts exist, the exercise of personal jurisdiction over a non-resident defendant will fail to satisfy due process requirements if the assertion of personal jurisdiction offends 'traditional notions of fair play and substantial justice.'" *Ruston Gas Turbines, Inc.*, 9 F.3d at 421 (quoting *Int'l Shoe*, 326 U.S. at 316). Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of personal jurisdiction in the forum would be unfair or unreasonable. *Wien Air Alaska v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999). "It is rare to say the assertion is unfair after minimum contacts have been shown." *Id.* A court is to consider the following factors in making the fairness determination: (1) the defendant's burden, (2) the forum state's interest, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's shared interest in furthering fundamental social policies. *Paz*, 445 F.3d at 814; *Ruston Gas Turbines*, Inc., 9 F.3d at 421. Here, Marsh has not met its burden in demonstrating that the exercise of personal jurisdiction over Marsh and Marsh USA offend traditional notions of fair play and substantial justice. As such, specific personal jurisdiction exists.

D. **This Court Has Jurisdiction Over Marsh Under a Single Business Enterprise Theory**

Because this Court has jurisdiction over Marsh's subsidiary Marsh USA, Marsh is subject to personal jurisdiction in this Court under the "single business enterprise" theory. Marsh's reliance on *Transure, Inc. v. Marsh and McLennan, Inc.*, 766 F.2d 1297 (9th Cir. 1985) is misplaced, as it is factually distinguishable, as the plaintiff in that case was not even a resident of California – the forum state. *Id.* Moreover, the plaintiff in *Transure* sought to exercise *general* jurisdiction over the nonresident defendant. Here, Plaintiffs seek to exercise *specific* jurisdiction over Marsh because the conduct at issue was directed at Louisiana. This is integral, and a

differentiating factor, in the Due Process analysis. Finally, Marsh cites to *Transure* for the proposition that the existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent company. Yet, the existence of such relationship is sufficient to establish personal jurisdiction over the parent when the subsidiary is or truly may be an alter ego of its parent corporation. A parent-subsidiary relationship with a company that has minimum contacts in the forum state is insufficient **on its own** to justify personal jurisdiction over the parent. *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 218 (5th Cir. 2000) (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)); *see also Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999). Rather, the plaintiff must make a *prima facie* showing that the parent corporation so controls the subsidiary that the activities of the subsidiary are attributable to the parent for jurisdictional purposes. *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593 (5th Cir. 1999). In discussing how a plaintiff can overcome the presumption of corporate separateness, the Fifth Circuit has stated:

> Invariably such clear evidence requires an additional or a "plus" factor, "something beyond the subsidiary's mere presence within the bosom of the corporate family." There must be evidence of one corporation asserting sufficient control to make the other its agent or alter ego. Moreover, the burden of making a *prima facie* showing of such symbiotic corporate relatedness is on the proponent of the agency/alter ego theory.

*Dickson Marine Inc.*, 179 F. 3d at 338 (internal citations omitted). Contrary to Marsh's assertions that Marsh USA's contacts with Louisiana cannot be imputed to Marsh for the purpose of establishing jurisdiction, the Fifth Circuit has previously explained that, "'[a] court which has jurisdiction over a corporation has jurisdiction over its alter egos.'" *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th Cir. 2010) (citations omitted). "'The theory . . . is that, because two corporations (or the corporation and its individual alter ego) are the same entity, the jurisdictional contacts of one are the jurisdictional contacts of the other for the purposes of the . . . due process

analysis.'" *Id.* (quoting *Patin v. Thoroughbred Power Boats, Inc*., 294 F.3d 640, 652 (5th Cir. 2002)).

In determining whether an entity is an alter ego or a single business enterprise, courts are instructed to look at the following factors: (1) common ownership, directors and officers, employees, and offices; (2) unified control;(3) inadequate capitalization;(4) non-compliance with corporate formalities; (5) centralized accounting; (6) unclear allocation of profits and losses between corporations; (7) one corporation paying the salaries, expenses, or losses of another corporation; (8) and undocumented transfers of funds between entities. *Id.* (*citing Hollowell v. Orleans Reg'l Hosp*. LLC, 217 F.3d 379, 385-89 (5th Cir. 2000)). Moreover, "[i]t should be noted that the alter ego test for attribution of contacts, *i.e.*, personal jurisdiction, is less stringent than that for liability." *Stuart v. Spademan*, 772 F.2d 1185, 1198 n.12 (5th Cir. 1985).

Here, there is a "plus factor" as it is clear that Marsh and Marsh USA operate as a single business enterprise using all of the various Marsh agencies to provide global insurance solutions and products. That is the crux of the factual scenario presented in this case. Marsh's Annual Report describes its risk and insurance services as follows:

> The Company is a global professional services firm offering clients advice in the areas of risk, strategy and people. The Company's 76,000 colleagues advise clients in over 130 countries. With annual revenue of $17 billion, the Company helps clients navigate an increasingly dynamic and complex environment through four market-leading businesses.

(R. Doc. 56-1 at p. 4; *see also id.* at p. 32 ("We conduct business globally. In 2020, approximately 53% of the Company's total revenue was generated from operations outside the United States, and over one-half of our employees were located outside the United States.")). The Risk and Insurance Services – including both Marsh USA and Marsh KSA -- generated approximately 60% of the Company's total revenue in 2020 and employs approximately 44,100 colleagues worldwide. (*Id.*).

As noted by Marsh, Marsh and Marsh USA have common officers, as one of Marsh's executive officers is also a director of Marsh USA. (R. Doc 56). Additionally, the "Consolidated Statements of Income" reported by Marsh in its 10-K creates an unclear allocation of profits and losses between Marsh and Marsh USA. (R. Doc. 56-1 at p. 64). The facts cited above by Plaintiffs underscore the interrelationship among and between Marsh USA, Marsh KSA and Marsh as a single business enterprise. Specifically, Marsh used the services of both Marsh USA and Marsh KSA in order to sell a single product – the Policy, for which Marsh received compensation. The 10-K further notes that Marsh "does not have significant operations of its own" and "is dependent upon dividends and other payments from its operating subsidiaries to pay principal and interest on its outstanding debt obligations, pay dividends to stockholders, repurchase its shares and pay corporate expenses." (R. Doc. 56-1 at p. 50). Here, Plaintiffs have specifically alleged that Marsh and Marsh USA operate as a single global enterprise by which all employees utilize the "marsh.com" email domain and conduct business by and between various Marsh affiliates and subsidiaries to service clients. Moreover, in this particular case, contact with Marsh was initiated in New Orleans by Plaintiffs seeking coverage for their overseas work. "Marsh" did procure that insurance – not once but twice – through continuous and systematic contacts with Plaintiffs in New Orleans. Moreover, the First Amended Complaint contains allegations that Marsh advertises its services to the general public as a "global leader in insurance broking and risk management" and relies upon the joint collective efforts of its wholly-owned subsidiaries, including Marsh USA. (R. Doc. 35 at ¶ 82). Finally, Plaintiffs allege that Marsh advertises all of its various subsidiaries as "Marsh Location Sites" in its general advertisements on the internet. (*Id.*)

The facts of this lawsuit satisfy the "plus factor," and Marsh USA's contacts should be imputed to Marsh and the motion to dismiss denied.

### E. In the Alternative, the Court Should Allow Jurisdictional Discovery

Plaintiff firmly believe that the evidence supporting personal jurisdiction is sufficient to support the necessary *prima facie* showing. However, to the extent the Court has any doubt whatsoever, Plaintiffs request the opportunity to conduct jurisdictional discovery concerning the factual issues raised in Marsh's Motion, the relationship of the Marsh entities, and the specific facts relating to this Policy, including the events of September 2019 onwards and all communications concerning the Policy and its issuance. When the defendant disputes jurisdiction, the court may receive interrogatories, depositions, or "any combination of the recognized methods of discovery" to help it resolve the jurisdictional issue. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 242-43 (5th Cir. 2008).

### III. The Complaint States a Claim Against Marsh Upon Which Relief Can Be Granted

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all well-pleaded, non-conclusory facts in the complaint as true and view them in a light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007) (emphasis added). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ramming v. U.S.,* 281 F.3d 158, 161 (5th Cir. 2001) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). "[O]nce a claim for relief has been stated, a plaintiff 'receives the benefit of imagination so long as the hypotheses are consistent with the complaint.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (citations omitted). "In seeking dismissal for failure to state a viable claim, a defendant thus bears the very high burden of showing that the plaintiff cannot conceivably prove any set of facts that would entitle him to relief." *Beck v. Deloitte & Touch, Deloitte, Haskins & Sellers, Ernest & Young, L.L.P.,* 144 F.3d 732, 735–36 (11th Cir. 1998) (internal citations omitted).

### A. The First Amended Complaint Adequately Alleges That Marsh Failed to Procure Adequate Insurance

First, Marsh alleges that Plaintiffs' First Amended Complaint should be dismissed for failure to state a claim against Marsh because it did not procure the Policy at issue. Marsh does not argue that the First Amended Complaint fails to provide any legally cognizable claims against Marsh. Instead, it disagrees with the facts pled. For instance, contrary to the well-pled factual allegations raised in the First Amended Complaint, Marsh alleges that neither Marsh nor Marsh USA acted as an insurance agent for DISA or Dynamic. However, factual disputes are an inappropriate basis for a motion to dismiss. *Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009) ("disputed issue[s] of material fact [] cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6)"). The court must disregard any contrary allegations of the opposing party. *See A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969); *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) (finding that a court "is not to . . . **resolve factual disputes** when ruling on a motion to dismiss"). Because Plaintiffs have alleged a plausible claim for relief against Marsh – the failure to procure adequate insurance coverage, including the failure to timely and properly bind the insurance – Marsh's Motion to Dismiss should be denied.

### B. The First Amended Complaint's Allegations Regarding Single Business Enterprise Theory Are Adequately Pled

Marsh additionally maintains that the Plaintiffs' single business enterprise theory claims should be dismissed because the Plaintiffs make conclusory allegations, rather than allege specific facts  sufficient to state a cause of action. To the contrary, Plaintiffs' allegations have been pled with more than reasonable specificity. As stated *supra*, in determining whether two entities operate as a single business enterprise, courts are instructed to look at the following factors: (1) common ownership, directors and officers, employees, and offices; (2) unified control; (3) inadequate capitalization; (4) non-compliance with corporate formalities; (5) centralized accounting; (6)

unclear allocation of profits and losses between corporations; (7) one corporation paying the salaries, expenses, or losses of another corporation; and (8) undocumented transfers of funds between entities. *Hollowell v. Orleans Reg'l Hosp.* LLC, 217 F.3d 379, 385-89 (5th Cir. 2000). As previously explained above, the allegations in the Plaintiffs' First Amended Complaint are sufficient to state a cause of action under a single business enterprise theory.

## IV. The Plaintiff's Claims Are Not Perempted Under La. Rev. Stat. 9:5606

Defendant Marsh further argues that Plaintiffs' claims are perempted under both the one-year and the three-year preemptive periods set forth in La. R.S. 9:5606. La. R.S. 9:5606 in pertinent part provides that: "[a]ll claims for damages against an insurance agent must be brought within one year from the date of the alleged act, omission, or neglect, or within one year of Plaintiff's discovery of the alleged act, omission, or neglect." The statute also imposes a three-year preemptive limit on these actions regardless of whether or not it was filed within the one-year limitation period. As summarized by the Fifth Circuit Court of Appeals, the statute requires a plaintiff to file suit "within one year of the plaintiff's knowledge or constructive knowledge of the act, omission, or neglect that led to the cause of action, and no later than three years after the act, omission, or neglect actually occurred." *Campbell v. Stone Ins.*, 509 F.3d 665, 670 (5th Cir. 2007).

The pertinent jurisprudence supports a finding that the subject claim is not perempted. Admittedly, Louisiana courts have previously found that the one-year preemptive period under La. Rev. Stat. § 9:5606 begins to run when the insured receives a copy of the original policy. (*See* R. Doc. 22-1 at p. 9). However, there are exceptions, some of which are applicable here. For instance, in *Romero v. Travelers Indem. Co. of Connecticut*, 2006 U.S. Dist. LEXIS 90124 (E.D. La. Dec 12, 2006), this Court held that an insured has a right to rely on what the agent represents and, therefore, preemption may start running on a later date than when the policy was delivered. It explained:

> Arguably, Romero could have discovered any gaps in her insurance coverage by carefully reading the policy. At the same time, without further factual development, the Court cannot determine whether Romero was **lulled into complacency** by representations made by Haeuser. The facts may disclose that Romero's reliance was well-founded, regardless of the actual language of the policy, and that Romero therefore is excused from its failure to discover the problem earlier.

*Id.* (emphasis added). An identical result was reached in *Hoffman v. Alliance Ins. Agency Services, Inc.*, 2007 U.S. Dist. LEXIS 52378 (E.D. La. Jul 19, 2007) where the insureds alleged that they relied on what their agent advised them about coverage. Similarly, in *Southern Athletic Club, LLC v. Hanover Ins. Co.*, 2006 U.S. Dist. LEXIS 66634 (E.D. La. 2006), the court held that the insured's claim was not perempted because he did not learn he was underinsured until after the loss. That is similar to what happened in this case, as the communications between September of 2019 and the first denial of coverage all indicated coverage was not at issue. Indeed, Plaintiffs were contacted by an adjusting firm indicating that the claim was covered. (Exh. A-14, A-15 and A-16).

Although the effective start date of the Policy was January 12, 2017, the Plaintiffs did not receive a copy of the Policy until November 14, 2019. Indeed, as established in the facts, no policy was *issued* until November 2019. Moreover, as the time of the issuance of the Policy, Plaintiffs were definitely lulled into complacency as the Notice of Claim was submitted and the Policy was then issued. Clearly, this indicated to Plaintiffs that they had coverage. While the Plaintiffs certainly had the opportunity to review the Policy upon receipt in order to discover any issues in coverage, they relied upon the expertise and advices of their brokers, namely Marsh. As such, the one-year preemptive period could not have begun to run any earlier than November 14, 2019, as Plaintiffs did not yet have constructive knowledge of Defendants Marsh and/or Marsh USA's failure to procure the requested coverage.

Plaintiffs did not learn about this failure to procure the requested coverage until September 28, 2020, when counsel for MAA denied coverage, notifying the Plaintiffs in writing that the policy

procured by Marsh was an excess policy. (*See* Exh. A-13). Therefore, the Plaintiffs' claims are not perempted under the one-year preemptive period as they timely filed their original Complaint on April 13, 2021, less than one year after the September 28, 2020 date on which they were apprised of Marsh and/or Marsh USA's failure to procure an adequate policy. Nor are Plaintiff's claims perempted under the three-year period as they filed suit within three years of November 14, 2019, the date on which Marsh and/or Marsh USA's failure actually occurred. Accordingly, Marsh's preemption argument fails.

## CONCLUSION

For the forgoing reasons, the Motion to Dismiss filed by Marsh & McLennan Companies, Inc. should be denied.

Respectfully submitted,

*/s/ L. Etienne Balart*
EDWARD D. WEGMANN (La. #13315)
L. ETIENNE BALART (La. #24951), T.A.
LAUREN C. MASTIO (La. #33077)
TAYLOR K. WIMBERLY (La. #38942)
JONES WALKER LLP
201 St. Charles Avenue, 48th Floor
New Orleans, Louisiana 70170-5100
Telephone: 504-582-8584
Facsimile: 504-589-8584
Email: ebalart@joneswalker.com
dwegmann@joneswalker.com
lmastio@joneswalker.com
twimberly@joneswalker.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has served on all counsel of record by hand, electronic filing, facsimile, email, and/or depositing a copy of same in the U. S. mail, postage prepaid this 24th day of August, 2021.

*/s/ L. Etienne Balart*