**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DYNAMIC INDUSTRIES, INC., DYNAMIC INDUSTRIES INTERNATIONAL, LLC and DYNAMIC INDUSTRIES SAUDI ARABIA, LTD.** | **CIVIL ACTION NO. 2:21-cv-748**<br><br>**JUDGE IVAN L.R. LEMELLE**<br><br>**MAGISTRATE JUDGE JANIS VAN MEERVELD** |
| **VERSUS** | |
| **METLIFE - AMERICAN INTERNATIONAL GROUP - ARAB NATIONAL BANK COOPERATIVE INSURANCE COMPANY; ET AL.** | |

## MEMORANDUM IN OPPOSITION TO MARSH USA, INC.'S MOTION TO DISMISS (R. DOC. 79)

Dynamic Industries, Inc. ("DI"), Dynamic Industries International, LLC ("DII") and

Dynamic Industries Saudi Arabia, Ltd. ("DISA") (collectively, "Plaintiffs"), respectfully submit

this Opposition to the Motion to Dismiss (R. Doc. 79) filed by Defendant Marsh USA, Inc. d/b/a/

Marsh USA Risk Services ("Marsh USA"). Marsh USA's Motion seeks dismissal of all claims

against it, but fails to address proper legal standards, ignores numerous relevant paragraphs of the

First Amended Complaint for Declaratory Relief and Damages ("First Amended Complaint") (R.

Doc. 35), improperly attempts to raise factual disputes at the Rule 12 stage and fundamentally

misunderstands Plaintiffs' central claim against Marsh USA. For these reasons, the Motion should

be denied.

### FACTUAL BACKGROUND

Plaintiffs seek coverage under a comprehensive general liability policy of insurance –

issued by some of the named Defendants – for an offshore demolition accident.  Marsh USA's

factual background seeks to reclassify this entire claim as a simple transaction involving the

purchase of insurance through a related Marsh company – Marsh KSA.[1] In so doing, Marsh USA ignores the pleaded facts that (i) Marsh KSA was never contacted by Plaintiffs to procure the insurance in question, (ii) Plaintiffs never entered into a brokerage agreement involving Marsh KSA until after the loss and only because Marsh KSA told Plaintiffs that this ***was a condition imposed by the underwriters prior to their agreeing to issue the Policy***, and (iii) Marsh USA continued to play its role as a "primary" broker through the report of loss and actual issuance of the Policy. This Policy was issued and delivered to Plaintiffs in Louisiana, not Saudi Arabia, and Defendant Marsh USA played a role in that procurement and delivery as detailed in prior pleadings.

## I. The Contract and the Policy

In 2015, DISA and Saudi Arabian Oil Company ("SAUDI ARAMCO") entered into a contract for procurement and construction, and, in 2016, a contract purchase order (collectively, the "Contract") to procure, fabricate, load-out, transport, demolish, replace install, test and pre-commission five (5) replacement pipelines and associated topside scraping facilities located in the Berri oil field in the Kingdom of Saudi Arabia (the "Project"). (R. Doc. 35, ¶ 15). Performance of the Contract by DISA was guaranteed by DI through a Parent Company Performance Guarantee, rendering DI directly liable for the obligations of DISA under the Contract. (*Id.* at ¶ 16). The Contract contains a clause obligating DISA to SAUDI ARAMCO for certain property damage caused by DISA or *any of its subcontractors (at any tier)* and fully responsible to SAUDI ARAMCO for the acts and omissions of *all of its subcontractors*. (*Id.* at ¶ 17).

Plaintiffs initiated the process of obtaining insurance on behalf of all three Dynamic-related companies for operations under the Contract by contacting Marsh USA's New Orleans office.

---

[1] Marsh Saudi Arabia Insurance & Reinsurance Brokers Saudi Arabia Riyadh.

(Declaration of M. Mahfouz at ¶ 5, attached hereto as Exhibit A). The Dynamic companies utilized the brokerage services of Marsh & McLennan Company, Inc. ("Marsh"), through its subsidiary Marsh USA, in order to procure an adequate primary insurance policy under the Contract, insuring all of the Dynamic companies for their liabilities. (Exh. A at ¶¶ 5-6). Through the coordinated efforts of Marsh, Marsh USA and Marsh KSA, Plaintiffs were told by the Marsh entities that a comprehensive general liability policy of insurance (the "Policy") from MetLife American International Group and the Arab National Bank Cooperative Insurance Company ("MetLife-AIG-ANB" or "MAA") had been obtained, both at the intended procurement in 2017 and the actual procurement in 2019. (*See* Exh. A at ¶ 7). Marsh informed Plaintiffs that it had provided the required insurance to cover the Dynamic entities during the Project. (*Id.*). Marsh USA understood, through discussion with Plaintiffs, that Plaintiffs wished to procure all necessary *primary* insurance to protect them as required under the Contract. (R. Doc. 35 at ¶ 20). This fact was critically underscored in the Fall of 2019 when Plaintiffs actually reported a loss to Marsh and discovered that, through no fault of its own, Marsh had not actually placed ***any insurance policy***.

While the Policy was supposed to be procured in January 2017 by and through Marsh, with Plaintiffs utilizing the insurance services and expertise of Marsh and/or Marsh USA to acquire the necessary coverage as required by the Contract, this, in fact, did not occur. (*See* Exh. A at ¶ 14; Exh. A-4). On January 20, 2017, **DI** issued its "Insurance Placement" letter to Marsh USA, Inc., with **DI**'s EVP and Chief Financial Officer executing the letter on Dynamic letterhead and DI's New Orleans address. (*See* Exh. A at ¶ 9; Exh. A-1). Regardless, Plaintiffs relied upon, and indeed paid for, the expertise and recommendations of Marsh USA and/or Marsh to procure the necessary insurance protecting Plaintiffs from any loss as required under the Contract. (*See* R. Doc. 35 at ¶ 19; Exh. A at ¶¶ 9-11). For the services provided by "Marsh," Dynamic Energy Service

International LLC, the parent company of DI, paid Marsh at least $25,000 for brokerage services relating to the alleged procurement of the Policy. (*See* Exh. A-3). Additionally, the premium for the Policy was invoiced to Plaintiff DISA by Marsh KSA on April 7, 2017 and paid on September 9, 2017. (*See* Exh. A-4). Despite this payment of premium, no insurance policy was procured at this time and no Marsh entity has explained why or what happened to the premium payment between payment in September of 2017 and actual placement of the Policy in November of 2019. In 2017, no Marsh entity ever requested a Broker of Record, Broker Letter of Authorization, Proposal Form or any similar document from any of the Plaintiffs. (*See* Exh. A at ¶ 14). On or about February 2, 2017, MAA provided the Dynamic entities via email to New Orleans with a Certificate of Insurance identifying the name and address of the Insured as "Dynamic Industries International LLC, 10777 Westheimer Rd Suite 975 USA". (Exh. A-2).

Although the Policy was supposed to be issued for the period January 12, 2017 to January 11, 2021, no actual policy was ever delivered to Plaintiffs until November of 2019, *after the loss in question*. (*See* Exh. A-5). Marsh KSA, acting as an agent of the insurer,[2] did not provide Plaintiffs with the actual, written Policy until November 19, 2019 when it was emailed and also sent to Plaintiffs via mail. (R. Doc. 35, ¶ 75; *see also* Exh. A-5).

## II. The Claim

Because Plaintiffs have direct contractual liability to SAUDI ARAMCO and its affiliates for certain property damage under the terms of the Contract, in the Fall of 2019 Plaintiffs sought primary insurance coverage under the Policy issued by MAA. Acting from New Orleans,

---

[2] Contrary to Walaa's assertions in its Reply in Further Support of Rule 12(b)(1) and (2) Motion to Dismiss (R. Doc. 80), the fact that Marsh KSA acted as an agent for Plaintiffs does not preclude Marsh KSA from acting as an agent for Walaa. The fact that Plaintiffs used their broker – "Marsh" – from its New Orleans office to procure the Policy does not alter the fact that Marsh, and more particularly Marsh KSA, acted on behalf of the underwriters (Walaa) as well, as clearly evidenced in the Declaration of Mark Mahfouz.

4

Louisiana, a Dynamic representative contacted Marsh's New Orleans office to notify Marsh of the loss. (*See* Exh. A-6). In turn, the local Marsh representative located in the New Orleans office – Theresa Bonin – contacted her Marsh counterpart in Saudi Arabia to provide notification of the loss on behalf of "Dynamic." (*Id.* at p. 10). Notably, in that transmission, the Marsh representative stated: "In reviewing our files and emails we cannot locate a copy of the **MetLife AIG ANB Cooperative Insurance Company** policy, although we do have copies of the reinsurance totaling 87.5%." (*Id.*) The Marsh representative closed by asking for a copy of the Policy and "that your email of January 17, 2017 [over two and a half years earlier] advised that 'In terms of claims, the local insurer will follow lead reinsurer's decision.'" (*Id.*) DI's General Counsel responded to this email with known details of the claim. (Exh. A-6 at p. 9).

The recipient of this first notice – a Marsh KSA employee[3] – responded noting that Marsh would notify the "lead reinsurer ***Chubb Dubai*** for a potential insurance claim." (*Id.* at 8 (emphasis added)). This communication was between the local Marsh representatives (Bonin and Laborde), DI's General Counsel (Mark Mahfouz) and Marsh KSA's office. Bonin – acting as Marsh USA – responded reiterating the need for the "local policy today." (*Id.*) The "Marsh" representative responded concerning the Chubb policy, to which Bonin asked "***[w]hy was the MetLife AIG ANB Cooperative Insurance Company policy not issued?***" (*See id.* at 7). She further commented: "The reinsurance policies do not provide 100% - only 87.5%. The certificate shows policy number 'TBA'. It seems important to us to have the actual policy and a policy number." (*See id.*)

After several email communications concerning the lack of provision of any policy among the Marsh employees, all of which included DI's General Counsel in New Orleans, on October 30,

---

[3] Vivek.Parkash@marsh.com.

2019, Plaintiffs requested an update on when it could expect delivery of the Policy. (*Id.* at p. 1). On November 4, 2019, Marsh responded as follows:

> There have been discussions with the ANB MetLife on the policy document issuance. **The file has been reviewed by their reinsurance manager and as of this week the main direct insurance underwriter has been asked to list out his requirements that will enable him to issue the policy wordings**.

(Exh. A-7 at p. 3 (emphasis added)). One day later, the Marsh KSA representative advised that there was a "contentious" meeting in Riyadh with ANB (one of the members of the MetLife AIG ANB Cooperative), who initially *rejected* issuing a policy. (Exh. A-8 at p. 1). This rejection was allegedly based on the "non-submission" of regulatory documents. One of these documents was the BOR, or Broker of Record, letter, which is noted in the Declaration of Syed Siddiq (R. Doc. 44-4). On November 5, 2019, Marsh KSA forwarded to Dynamic a number of documents that were represented as required by ANB, the basis on which ANB would issue the Policy. (*See* Exh. A-8). Included within these documents was the "underwriting information" that the insurers had received. The underwriting information contained email communications from Dynamic representatives about the Project and identified Dynamic Industries, Inc. (Exh. A-8 at pp. 10-33).

Marsh KSA subsequently requested the help of both Dynamic in New Orleans **and** Marsh in New Orleans in order to obtain actual issuance of the Policy. (*See* Exh. A at ¶ 24). In order to issue the Policy, Marsh requested – from New Orleans – the back-dated execution of two documents: (1) a Broker's Letter Authorization ("BLA"); and (2) a Proposal Form from MAA.[4] (*See* Exh. A-7 at p. 2). Marsh also noted the "underwriting information" for the Project, a .zip file that includes various communications from the Plaintiffs. (*See* Exh. A-8). With respect to the Proposal Form, Bonin, acting through Marsh USA and for Plaintiffs, responded on November 6,

---

[4] At no time prior to November of 2019 were Plaintiffs ever advised by Marsh or MAA that a BLA or Proposal Form was required to issue the Policy. (*See* Exh. A at ¶ 26).

2019 as follows: "With respect to the Proposal Form, ANB issued the attached COI confirming that they were on risk as of 12 January 2017 and your email of 26 January 2017, copy attached, also confirmed 100% cover placed. The client should not need to submit any additional information at this time." (Exh. A-7 at p. 1).

The Marsh KSA representative replied to Bonin that required submission of the Proposal Form *after* the loss was "inflexible" and deemed a regulatory requirement by ANB prior to issuance of a policy. (*Id.*)  Clearly, this action by Marsh KSA was on behalf of the underwriters, advising Plaintiffs of what underwriters needed before issuing the Policy.  On November 6, 2019, DI's General Counsel, from New Orleans, sent Marsh the signed BLA on behalf of DISA.  (Exh. A at ¶ 29; A-9). No such letter was ever requested on behalf of DII or DI.  (Exh. A at ¶ 29).  The BLA was signed by DISA in November of 2019, despite it being back dated January 1, 2017 as demanded by Marsh and/or ANB and/or the underwriters for the Policy. (Exh. A at ¶¶ 28-29). Marsh USA was a copy recipient of the BLA.  (Exh. A-9 at pp. 6-7).

On November 8, 2019, Marsh, acting for the insurers, advised that Plaintiffs would have to back date the Proposal Form to December of 2016 or a date in January of 2017 to "factually align with the information submitted by Dynamic to Marsh and by Marsh to the insurer at that time." (Exh. A-10 at p. 1).  The Proposal Form was then signed by Dynamic and sent by Dynamic – from its New Orleans offices – for delivery to the underwriters, which Marsh confirmed was "submitted to the insurance company."  (Exh. A-11 at p. 1). Thereafter, on November 14, 2019, the Policy was electronically mailed to Plaintiffs by Marsh on behalf of the insurers, and also mailed in hard copy to Dynamic and received by Dynamic in New Orleans, Louisiana.[5] (Exh. A

---

[5] In fact, Plaintiffs have no record of the Policy ever having been delivered by anyone to any Dynamic entity, including DISA, in Saudi Arabia.  (Exh. A at ¶ 35).

at ¶ 35).

In the BLA dated January 1, 2017, Plaintiff DISA exclusively appointed Marsh KSA to *communicate* on DISA's behalf with any insurance company located in Saudi Arabia. (*See* Exh. A-9 at pp. 6-7). Importantly, while the appointment certainly authorized Marsh KSA to initiate communications regarding the procurement of any insurance policy, it did not authorize Marsh KSA to procure any insurance policy or take delivery of any policy, either on DISA's behalf or the other Plaintiffs.[6] Rather, the actual procurement of an insurance policy was the responsibility of Marsh, and the delivery of the policy was the responsibility of the insurer. The Policy was never delivered to any Dynamic entity in Saudi Arabia. (Exh. A at ¶ 36). The Policy was formally issued as of November 14, 2019.

## III. The Denial

MAA denied coverage under the Policy via an email dated September 28, 2020. (*See* Exh. A-13). Upon receipt of denial, Plaintiffs contacted their broker Marsh, through its subsidiary Marsh USA, for assistance in appealing the denial of Plaintiffs' claim under the Policy. (*See* Exh. A-14). Thereafter, Marsh USA initiated discussions with Marsh KSA to facilitate such conversations between Marsh USA and the claims manager responsible for reevaluating the Plaintiffs' claim under the Policy. (*See* Exh. A-15). Marsh KSA obtained and provided the contact information for the MAA claim manager of the Policy, and Plaintiffs contacted the claim manager shortly thereafter. (*See* Exh. A-16). After the MAA claim manager failed to provide a substantive

---

[6] Co-defendant Walaa and, to a degree, Marsh USA continue to argue that the Broker's Letter of Authorization authorizes Marsh KSA to accept the Policy on behalf of the insured. This is contrary to the plain wording of authorization – which does not state that Marsh KSA is appointed as agent to receive the Policy, and the terms of the Policy themselves which states nothing about delivery through a broker. Indeed, the Policy lists Marsh KSA on the invoice for the premium (which had already been collected two years prior). The BLA authorizes Marsh KSA to communicate on its behalf; and authorizes MAA to "furnish information" requested by "MARSH" "as it pertains to our insurance contracts, rates, rating schedules, surveys, reserves, retention, policies, certificates or other data MARSH may request."

response to multiple emails regarding coverage, Plaintiffs sent one final demand letter requesting coverage under the Policy on February 12, 2021. (*See* Exh. A-17). MAA denied coverage, so the claim is now ripe for review.

As has been revealed in the detailed briefing to date, this was no ordinary insurance transaction, and it most certainly was not a simple insurance transaction where Marsh USA simply turned over the reins to Marsh KSA, as alleged in its motion. To the contrary, the limited documents that have already been identified show how ingrained Marsh USA remained. For instance, in December of 2017 Marsh USA – not Marsh KSA – was advising Plaintiffs about specific policy coverages. (Exh. A at ¶ 11; A-3 at p. 5). Prior, in January of 2017, Marsh USA's representative was requesting on behalf of "we" a letter from Plaintiffs that there were no known or reported losses as of that date. (Exh. A at ¶10, p. 4). The Marsh USA representative goes on to advise Plaintiffs of the reporting from Marsh KSA about confirmation of the insurance and reinsurance carriers. (*Id.*). The following day, Ms. Bonin of Marsh USA thanks Dynamic's chief financial officer for providing information as requested by "Marsh." (Exh. A-2 at p. 3). In that same email chain, the Marsh KSA representative, reporting to Marsh USA, refers to the Marsh "broking team" having secured 102.5% subscription on the policy package, and recommends these carriers based on the experience of "Marsh Energy," another Marsh company. (Exh. A-2 at p. 5). Moreover, in November of 2019, Marsh USA was requesting that Marsh KSA require "ANB issue the policy upon submission of an unsigned application or one signed by you instead of Dynamic." (Exh. A at ¶15; A-5 at pp. 14-15). Important and central to Plaintiffs' claims is the effect that the lack of actual placement of coverage may have had on the decision to ultimately deny coverage. Stated differently, at this early stage, and given the stance taken by the purported insurer, Plaintiffs have stated a valid claim for negligent brokering based on the failure to properly place the

insurance in the first instance, and whatever transpired during the period of time after the loss was reported and when the Policy was actually issued.

## LAW AND ARGUMENT

### I. The Complaint States a Claim Against Marsh USA Upon Which Relief Can Be Granted

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all well-pleaded, non-conclusory facts in the complaint as true and view them in a light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007) (emphasis added). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ramming v. U.S.,* 281 F.3d 158, 161 (5th Cir. 2001) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). "[O]nce a claim for relief has been stated, a plaintiff 'receives the benefit of imagination so long as the hypotheses are consistent with the complaint.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (citations omitted). "In seeking dismissal for failure to state a viable claim, a defendant thus bears the very high burden of showing that the plaintiff cannot conceivably prove any set of facts that would entitle him to relief." *Beck v. Deloitte & Touch, Deloitte, Haskins & Sellers, Ernest & Young, L.L.P.,* 144 F.3d 732, 735–36 (11th Cir. 1998) (internal citations omitted).

### A. The First Amended Complaint Adequately Alleges That Marsh USA Failed to Procure Adequate Insurance

First, Marsh USA alleges that Plaintiffs' First Amended Complaint should be dismissed for failure to state a claim against Marsh USA because it did not procure the Policy at issue. Marsh USA does not argue that the First Amended Complaint fails to provide any legally cognizable claims against Marsh USA. Instead, it disagrees with the facts pled. For instance, contrary to the well-pled factual allegations raised in the First Amended Complaint, Marsh USA alleges that

neither Marsh nor Marsh USA acted as an insurance agent for DISA or Dynamic. The Complaint and Amended Complaint plead facts specifically contrary to this contention. Factual disputes are an inappropriate basis for a motion to dismiss. *Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009) ("disputed issue[s] of material fact [] cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6)"). The court must disregard any contrary allegations of the opposing party. *See A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969); *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) (finding that a court "is not to . . . **resolve factual disputes** when ruling on a motion to dismiss"). Because Plaintiffs have alleged a plausible claim for relief against Marsh USA – the failure to procure adequate insurance coverage, including the failure to timely and properly bind the insurance – Marsh USA's Motion to Dismiss must be denied. Simply because Marsh KSA may have had to "place" the Policy because of limitations in Saudi Arabian regulations does not change or eliminate the actual facts of this case. Those facts, as both plead in the complaints and as more fully described in the Declaration of Mr. Mahfouz show Marsh USA's primary and constant involvement in the placement and procurement of this insurance.

## B. The First Amended Complaint's Allegations Regarding Single Business Enterprise Theory Are Adequately Pled

Marsh USA additionally maintains that the Plaintiffs' single business enterprise theory claims should be dismissed because the Plaintiffs make conclusory allegations, rather than allege specific facts sufficient to state a cause of action. To the contrary, Plaintiffs' allegations have been pled with more than reasonable specificity, and the detailed factual background in opposing Walaa's motions show the interconnection and relationship by and between Marsh, Marsh USA and Marsh KSA. In determining whether two entities operate as a single business enterprise, courts are instructed to look at the following factors: (1) common ownership, directors and officers, employees, and offices; (2) unified control; (3) inadequate capitalization; (4) non-compliance with

corporate formalities; (5) centralized accounting; (6) unclear allocation of profits and losses between corporations; (7) one corporation paying the salaries, expenses, or losses of another corporation; and (8) undocumented transfers of funds between entities. *Hollowell v. Orleans Reg'l Hosp*. LLC, 217 F.3d 379, 385-89 (5th Cir. 2000). The allegations in the First Amended Complaint are sufficient to state a cause of action under a single business enterprise theory, as it is clear that Marsh and Marsh USA operate as a single business enterprise using all of the various Marsh agencies – in this case Marsh KSA – to provide global insurance solutions and products to local clients. In fact, Marsh's Annual Report describes its risk and insurance services as follows:

> The Company is a global professional services firm offering clients advice in the areas of risk, strategy and people. The Company's 76,000 colleagues advise clients in over 130 countries. With annual revenue of $17 billion, the Company helps clients navigate an increasingly dynamic and complex environment through four market-leading businesses.

(R. Doc. 56-1 at p. 4; *see also id.* at p. 32 ("We conduct business globally. In 2020, approximately 53% of the Company's total revenue was generated from operations outside the United States, and over one-half of our employees were located outside the United States.")). The Risk and Insurance Services – including both Marsh USA and Marsh KSA – generated approximately 60% of the Company's total revenue in 2020 and employs approximately 44,100 colleagues worldwide. (*Id.*). Here, Marsh USA did exactly what it advertises Marsh's services as – it used that relationship and worked hand-in-hand with Marsh KSA to broker and eventually place the Policy, to the benefit of "Marsh" as a global professional services firm.

Marsh and Marsh USA have common officers, as one of Marsh's executive officers is also a director of Marsh USA. (R. Doc 56). Additionally, the "Consolidated Statements of Income" reported by Marsh in its 10-K creates an unclear allocation of profits and losses between Marsh and Marsh USA. (R. Doc. 56-1 at p. 64). The facts cited above by Plaintiffs underscore the

interrelationship among and between Marsh USA, Marsh KSA and Marsh as a single business enterprise. Specifically, Marsh used the services of both Marsh USA and Marsh KSA in order to sell a single product – the Policy, for which Marsh received compensation. The 10-K further notes that Marsh "does not have significant operations of its own" and "is dependent upon dividends and other payments from its operating subsidiaries to pay principal and interest on its outstanding debt obligations, pay dividends to stockholders, repurchase its shares and pay corporate expenses." (R. Doc. 56-1 at p. 50). Here, Plaintiffs have specifically alleged that Marsh and Marsh USA operate as a single global enterprise by which all employees utilize the "marsh.com" email domain and conduct business by and between various Marsh affiliates and subsidiaries to service clients. Moreover, in this particular case, contact with Marsh was initiated in New Orleans by Plaintiffs seeking coverage for their overseas work. Marsh, through its subsidiary Marsh USA, did procure that insurance – not once but twice – through continuous and systematic contacts with Plaintiffs in New Orleans. Moreover, the First Amended Complaint contains allegations that Marsh advertises its services to the general public as a "global leader in insurance broking and risk management" and relies upon the joint collective efforts of its wholly-owned subsidiaries, including Marsh USA. (R. Doc. 35 at ¶ 82). Finally, Plaintiffs allege that Marsh advertises all of its various subsidiaries as "Marsh Location Sites" in its general advertisements on the internet. (*Id.*). These facts clearly establish a cognizable claim for single business enterprise.

Moreover, as more factually supported in opposing Walaa's motion, Marsh, Marsh USA and Marsh KSA appeared to have played a dual role as agents or brokers for both Plaintiffs and Walaa/MAA, albeit with Marsh KSA being primarily the representative of the insurer. For instance, in the email exchange attached as Exhibit A-7, the Marsh KSA representative is continuously responding to Plaintiffs and Marsh USA, with Ms. Bonin of Marsh USA making

multiple demands for production of the Policy actually placed, to no avail. (Exh. A at ¶ 22; A-7). As noted above, in communications concerning the original placement of the Policy, Marsh KSA and Marsh USA were acting in a coordinated capacity as a "brokering team." (Exh. A-2 at p. 5).

Marsh USA's argument regarding the single business enterprise claims is the same as that presented by Marsh in Rec. Doc. 22, citing to the same jurisprudence. As noted by Plaintiffs in their opposition to that motion, at this early stage, and based on these specific facts, Plaintiffs have stated a viable cause of action and are entitled to engage in discovery to ascertain the true involvement of Marsh USA, Marsh, and Marsh KSA as a related, sister company in brokering and procuring this Policy.

## II.     This Court Has Subject Matter Jurisdiction

Marsh USA further seeks to dismiss the Amended Complaint based on a lack of subject matter jurisdiction. "A motion to dismiss for lack of subject-matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief." *Sureshot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 754 F. App'x 235, 239 (5th Cir. 2018) (citing *Wagstaff v. U.S. Dep't of Educ.*, 509 F.3d 661, 663 (5th Cir. 2007)).

Indeed, Plaintiffs have asserted diversity of citizenship jurisdiction as the basis for subject matter jurisdiction. (R. Doc. 35 at ¶ 12). The diversity statute generally provides for federal jurisdiction over suits involving foreign citizens or subjects in two scenarios. First, the statute contemplates federal jurisdiction over a lawsuit where the amount in controversy exceeds $75,000 and the suit is between citizens of an American state and citizens or subjects of a foreign state. 28 U.S.C. § 1332(a)(2). The diversity statute also expressly provides for jurisdiction where the amount in controversy exceeds $75,000 and the suit is between citizens of states and in which citizens or subjects of a foreign state are additional parties. 28 U.S.C. § 1332(a)(3).

In this latter scenario, section 1332(a)(3) provides a federal court with jurisdiction where the domestic parties on opposite sides of the case are diverse. Moreover, the diverse domestic parties need not be the principal adversaries in the suit. As long as the diverse domestic parties have a *legitimate* dispute, section 1332(a)(3) confers jurisdiction even when the main suit involves one or more alien parties. It is irrelevant for diversity purposes that the aliens on both sides of the dispute come from the same country. *See, e.g., Tango Music, LLC v. Deadquick Music, Inc.,* 348 F.3d 244, 245–246 (7th Cir. 2003) (statute does not say "... citizens or subjects of different foreign states," and court could not think of reason to depart from literal reading); *Bank of New York v. Bank of America*, 861 F. Supp. 225, 229 (S.D.N.Y. 1994) (aliens on opposite sides of an action hail from the same country has no bearing on the existence of diversity under § 1332(a)(3)); *Clark v. Yellow Freight Sys., Inc.*, 715 F. Supp. 1377, 1378 (E.D. Mich. 1989) (jurisdiction exists under § 1332(a)(3) even though one plaintiff and one defendant were Canadian citizens, where there was a legitimate dispute between a Michigan corporation and an Indiana corporation); *Zenith Elec. Corp. v. Kimball Intern. Mfg., Inc.*, 114 F. Supp. 2d 764, 771 (N.D. Ill. 2000) (jurisdiction existed where the domestic parties on opposite sides of the cases were diverse even though citizens of Mexico were also present on both sides of the case). Therefore, the presence of aliens on opposite sides of an action, even if they are citizens of the same foreign country, does not destroy diversity jurisdiction where the domestic parties are diverse. *Allendale Mutual Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 428 (7th Cir. 1993); *Transure, Inc. v. Marsh & McLennan, Inc.*, 766 F.2d 1297, 1299 (9th Cir. 1985). Article III of the Constitution requires only minimal diversity. *State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 531 (1967); *see also Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 492 n.18 (1983).

Here, this Court has subject matter jurisdiction under section 1332(a)(3), as the amount in controversy exceeds $ 75,000, the suit is between citizens of different states and citizens or subjects of a foreign state are additional parties. The Plaintiffs include two Louisiana citizens and one Saudi Arabian citizen. Likewise, the Defendants include two Delaware and New York citizens and two Saudi Arabian citizens. As stated above, because the domestic parties are completely diverse and have a legitimate dispute, the presence of foreign parties on opposite sides of the action does not destroy diversity. While Marsh USA does not appear to challenge the amount in controversy or citizenship of the domestic or foreign parties, it maintains that federal jurisdiction cannot be conferred under Section 1332(a)(3) because the domestic parties do not have a "legitimate" dispute. According to Marsh USA, there is no legitimate dispute between the domestic parties because the principal dispute is between the additional foreign parties.

This argument simply glosses over the actual facts of this dispute, and misses entirely that a central aspect of Plaintiffs claims are the failure to actually timely place the Policy and what effect the placement of the Policy *after the loss* had on the coverage decision. The dispute between the Marsh defendants and Plaintiffs is certainly "legitimate," even based on the most innocent reading of the facts as provided in the limited emails available to Plaintiffs at this stage. The actions or inactions of Marsh and March USA between 2017 (when the Policy was supposed to be placed) and November of 2019, when the Policy was actually delivered, bear directly on this dispute. Discovery may reveal that the placement of the insurance after the loss played a role in the decision to not provide coverage. Contrary to Marsh USA's implication, there is no requirement that the diverse domestic citizens be *principal* adversaries, only that they be *legitimate* adversaries. *Dresser Indus. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 500 (3d Cir. 1997); *see also* 15A Moore's Federal Practice - Civil § 102.71 (2021). In *Dresser*, the defendant (London Market

Insurers) argued that the addition of a domestic insurer holding 0.564% of the policy was not "legitimate" because the London Market Insurers were the principal parties. The court rejected this argument, stating that so long as there is a "legitimate" dispute between the citizens involved, jurisdiction under 28 U.S.C. § 1332(a)(3) exists. The court noted that the term "additional" does not reference the level of involvement of the parties or the interests at stake; rather, all that is required is a legitimate controversy between diverse citizens. *Id.* at 500.

Here, the domestic Plaintiffs DI and DII clearly have a legitimate dispute with the domestic Defendants Marsh and Marsh USA as the agents and/or brokers to the insurance policy at issue. By way of example, the Plaintiffs, which include two Louisiana citizens, seek to recover from Marsh USA, a Delaware and New York citizen, based on the assertion that Marsh USA procured an excess insurance policy when it should have procured a primary insurance policy. The failure to procure an adequate insurance policy is clearly a legitimate dispute, providing this Court jurisdiction under section 1332(a)(3), as are the actions and inactions of Marsh and Marsh USA in the time period leading up to November of 2017 when the loss was reported and it was discovered that no Policy had been issued. For these reasons, Marsh USA's Motion to Dismiss based on a lack of subject matter jurisdiction should be denied.

### III. The Plaintiff's Claims Are Not Perempted Under La. Rev. Stat. 9:5606

Defendant Marsh USA further argues that Plaintiffs' claims are perempted under both the one-year and the three-year peremptive periods set forth in La. R.S. 9:5606, amazingly relying on January 12, 2017 as the start date for the three-year peremptive period despite no Policy having been issued. This fictitious "issuance date" cannot be used to argue that claims against Marsh are perempted.

La. R.S. 9:5606, in pertinent part, provides that: "[a]ll claims for damages against an insurance agent must be brought within one year from the date of the alleged act, omission, or

neglect, or within one year of Plaintiff's discovery of the alleged act, omission, or neglect." The statute also imposes a three-year preemptive limit on these actions regardless of whether or not it was filed within the one-year limitation period. As summarized by the Fifth Circuit Court of Appeals, the statute requires a plaintiff to file suit "within one year of the plaintiff's knowledge or constructive knowledge of the act, omission, or neglect that led to the cause of action, and no later than three years after the act, omission, or neglect actually occurred." *Campbell v. Stone Ins.*, 509 F.3d 665, 670 (5th Cir. 2007). Here, Marsh USA cannot use the fictitious issuance date of the Policy because no such policy was ever sent out. The cases cited by Marsh USA in its memorandum in support all construe the statue in light of a situation where the policy was actually issued to the insured.

The pertinent jurisprudence supports a finding that the subject claim is not perempted. While Louisiana courts have previously found that the one-year preemptive period under La. Rev. Stat. § 9:5606 begins to run when the insured receives a copy of the original policy, that is not the case here. (*See* R. Doc. 79-1 at p. 13). There are exceptions, some of which are applicable here. For instance, in *Romero v. Travelers Indem. Co. of Connecticut*, 2006 U.S. Dist. LEXIS 90124 (E.D. La. Dec 12, 2006), this Court held that an insured has a right to rely on what the agent represents and, therefore, peremption may start running on a later date than when the policy was delivered. The Court explained:

> Arguably, Romero could have discovered any gaps in her insurance coverage by carefully reading the policy. At the same time, without further factual development, the Court cannot determine whether Romero was **lulled into complacency** by representations made by Haeuser. The facts may disclose that Romero's reliance was well-founded, regardless of the actual language of the policy, and that Romero therefore is excused from its failure to discover the problem earlier.

*Id.* (emphasis added). An identical result was reached in *Hoffman v. Alliance Ins. Agency Services, Inc.*, 2007 U.S. Dist. LEXIS 52378 (E.D. La. Jul 19, 2007) where the insureds alleged that they

relied on what their agent advised them about coverage. Similarly, in *Southern Athletic Club, LLC v. Hanover Ins. Co.*, 2006 U.S. Dist. LEXIS 66634 (E.D. La. 2006), the court held that the insured's claim was not perempted because he did not learn he was underinsured until after the loss. That is similar to what happened in this case, as the communications between September of 2019 and the first denial of coverage all indicated coverage was not at issue, only obtaining the actual Policy wording. (See generally, Exhs. A-5; A-6; A-7 and A-8). Indeed, Plaintiffs were contacted by an adjusting firm after the notice of loss and after the issuance of the Policy, indicating that the claim was covered. (Exh. A-14, A-15 and A-16).

Although the effective start date of the Policy was January 12, 2017, the Plaintiffs did not receive a copy of the Policy until November 14, 2019. Indeed, as established in the facts, no policy was *issued* until November 2019. Moreover, as the time of the issuance of the Policy, Plaintiffs were definitely lulled into complacency as the Notice of Claim was submitted and the Policy was then issued. Clearly, this indicated to Plaintiffs that they had coverage. While the Plaintiffs certainly had the opportunity to review the Policy upon receipt in order to discover any issues in coverage, they relied upon the expertise and advices of their brokers, namely Marsh and Marsh USA. As such, the one-year preemptive period could not have begun to run any earlier than November 14, 2019, as Plaintiffs did not yet have constructive knowledge of Defendants Marsh and/or Marsh USA's failure to procure the requested coverage. And, more importantly, at this juncture given that the claim had been reported prior and the Policy issued after, Plaintiffs certainly had no reason to believe or even anticipate that coverage would then be denied.

Plaintiffs did not learn about this failure to procure the requested coverage until September 28, 2020, when counsel for MAA denied coverage, notifying the Plaintiffs in writing that the policy procured by Marsh was an excess policy. (*See* Exh. A-13). Therefore, the Plaintiffs' claims are not

perempted under the one-year preemptive period as they timely filed their original Complaint on April 13, 2021, less than one year after the September 28, 2020 date on which they were apprised of Marsh and/or Marsh USA's failure to procure an adequate policy by the denial of coverage. The intervening period of time gave Plaintiffs zero indication that a Policy Marsh had procured *after a notice of loss* would not be honored. Nor are Plaintiff's claims perempted under the three-year period as they filed suit within three years of November 14, 2019, the date on which Marsh and/or Marsh USA's actually procured the Policy at issue. Accordingly, Marsh USA's peremption argument fails.

## IV.    This Court's Personal Jurisdiction Over Marsh KSA is Immaterial

Finally, Marsh USA seeks to dismiss the suit based on lack of personal jurisdiction. Interestingly, Marsh USA does not dispute this Court's personal jurisdiction over itself. Rather, it contends that dismissal is warranted because the Court does not have personal jurisdiction over Marsh KSA, a non-party to this suit.[7] As an initial matter, whether or not Marsh KSA is subject to this Court's personal jurisdiction is completely irrelevant to Marsh USA's pending Motion to Dismiss. In any event, this Court would very well have personal jurisdiction over Marsh KSA for the same reasons that it has personal jurisdiction over Walaa – because the Policy was issued and delivered here in New Orleans. (R. Doc. 70). Specific personal jurisdiction comporting with Due Process exists because the Policy in question was delivered in New Orleans, Louisiana, and this dispute exclusively arises out of that Policy. Over the course of several weeks, Marsh KSA, as agent/broker of MAA (the entity that Walaa claims to have assumed all liabilities of), negotiated

---

[7] Marsh USA takes issue with Plaintiffs' decision not to sue Marsh KSA in this action. First, as detailed in the pleadings to date, Plaintiffs hired Marsh USA, not Marsh KSA, to procure insurance. Marsh KSA's brokerage agreement was signed after the loss and only because Marsh KSA stated that its execution was an absolute condition precedent of the insurer. Plaintiffs have, instead, chosen to name the involved domestic parties because if the single business enterprise claims succeed, and are further supported by discovered facts, the liabilities of Marsh KSA would be the responsibility of Marsh.

the acquisition of this Policy and issued the actual Policy to the Plaintiffs in Louisiana. Moreover, Marsh KSA issued the invoice for the Policy to the Plaintiffs in New Orleans.[8] These continuous and systematic contacts with the forum state of Louisiana create a *prima facie* showing of personal jurisdiction over Marsh KSA, despite the fact that it irrelevant to the claims asserted against Marsh USA.

## CONCLUSION

For the forgoing reasons, the Motion to Dismiss filed by Marsh USA, Inc. should be denied.

Respectfully submitted,

*/s/ L. Etienne Balart*
EDWARD D. WEGMANN (La. #13315)
L. ETIENNE BALART (La. #24951), T.A.
LAUREN C. MASTIO (La. #33077)
TAYLOR K. WIMBERLY (La. #38942)
JONES WALKER LLP
201 St. Charles Avenue, 48th Floor
New Orleans, Louisiana 70170-5100
Telephone: 504-582-8584
Facsimile: 504-589-8584
Email: ebalart@joneswalker.com
         dwegmann@joneswalker.com
         lmastio@joneswalker.com
         twimberly@joneswalker.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has served on all counsel of record by hand, electronic filing, facsimile, email, and/or depositing a copy of same in the U. S. mail, postage prepaid this 5th day of October, 2021.

*/s/ L. Etienne Balart*

---

[8] Walaa maintains that Marsh KSA was not a broker for Walaa because no contract existed between Marsh KSA and Walaa. (R. Doc. 80). Yet Walaa relied on Marsh KSA to distribute and collect the insurance premium on the Policy. Surely, Walaa would never have allowed an entity with whom it had no contract to collect a premium of $476,531.00.