UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DYNAMIC INDUSTRIES, INC., ET AL.         CIVIL ACTION

VERSUS                                    NO. 21-748

METLIFE – AMERICAN INTERNATIONAL      SECTION "B"(1)
GROUP – ARAB NATIONAL BANK COOPERATIVE
INSURANCE COMPANY, ET AL.

## ORDER AND REASONS

Before the Court are two motions: defendant Marsh USA, Inc. ("Marsh USA")'s motion to dismiss pursuant to Rules 12(b)(1), (2), and (6) (Rec. Docs. 79, 84, 88) and defendant Marsh & McLennan Company, Inc. ("MMC")'s motion to dismiss pursuant to Rules 12(b)(1), (2), and (6) (Rec. Docs. 22, 56, 65, 83).

For the reasons discussed below,

**IT IS ORDERED** that defendant Marsh USA's motion to dismiss pursuant to Rule 12(b)(1) and (2) (Rec. Doc. 79) is **DENIED** and motion to dismiss pursuant to Rule 12(b)(6) (Rec. Doc. 79) is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant MMC's motion to dismiss pursuant to Rule 12(b)(1) (Rec. Doc. 22) is **DENIED** and motion to dismiss pursuant to Rule 12(b)(2) and (6) (Rec. Doc. 22) is **GRANTED.**

## I.   FACTS AND PROCEDURAL HISTORY

On June 10, 2015, Dynamic Industries Saudi Arabia, Ltd. (DISA) entered into a contract with Saudi Arabian Oil Company (SAUDI

1

ARAMCO) to replace five pipelines located in the Berri field in the Kingdom of Saudi Arabia. Rec. Doc. 35 at 4. DISA is a Saudi Arabian limited liability company headquartered in Al-Khobar Kingdom of Saudi Arabia. *Id.* at 2. This contract required DISA to obtain "normal and customary general liability insurance" for the pipeline project, including insurance for personal injury or property damage. *Id.* at 8-9. Dynamic Industries, Inc. ("Dynamic"), DISA's parent company, guaranteed DISA's performance of the contract and assumed direct liability for DISA's obligations through a Parent Company Performance Guarantee. *Id.* at 4. Dynamic is a corporation organized under the laws of the State of Louisiana with its principal place of business in New Orleans, Louisiana. *Id.* at 1. Dynamic Industries International, LLC ("Dynamic International") is Dynamic's parent company and is a limited liability company with its principal place of business in New Orleans, Louisiana. *Id.* at 2; *see also* Rec. Doc. 70 at 3.

To obtain insurance for the Saudi Arabia project, plaintiffs contacted Marsh USA's New Orleans office. Rec. Doc. 22-3 at 2; Rec. Doc. 84-1 at 2. Marsh USA is a Delaware corporation with its principal place of business in New York that is authorized to do business in Louisiana, but not Saudi Arabia. Rec. Doc. 79-1 at 3. Plaintiffs paid Marsh USA at least $25,000 for "casualty consulting." Rec. Doc. 70-1 at 18-21, 23-24. For assistance in procuring plaintiffs' required insurance, Marsh USA contacted

Marsh Saudi Arabia Insurance & Reinsurance Brokers Saudi Arabia Riyadh ("Marsh KSA"). Rec. Doc. 84-1 at 2; Rec. Doc. 22-3 at 2. Marsh KSA is a Saudi Arabian corporation headquartered in Riyadh, Saudi Arabia and licensed by SAMA to broker insurance policies that provide coverage for risks in Saudi Arabia. Rec. Doc. 22-3 at 2.

On January 26, 2017, a representative from Marsh KSA informed the EVP and Chief Financial Officer of Dynamic International that "100% cover" was placed with Metlife-American International Group-Arab National Bank Cooperative Insurance Company ("MAA")[1] for an inception date of January 12, 2017. Rec. Doc. 70-1 at 3. On or about February 2, 2017, MAA provided plaintiffs with a Certificate of Insurance identifying the name and address of the insured as "Dynamic Industries International LLC, 10777 Westheimer Rd Suite 975 USA." *Id.* at 15. Dynamic International, Marsh USA, and Marsh KSA exchanged numerous emails prior to this certificate's issuance. *Id.* at 8-14. On September 7, 2017, DISA paid Marsh KSA $476,531.00 for the premium required for MAA's general liability insurance policy. *Id.* at 26-27.

To fulfill its contractual obligations with SAUDI ARAMCO, DISA utilized subcontractors, including Offshore Oil Engineering

---

[1] On March 1, 2020, MAA merged with Walaa Corporation (Walaa). Rec. Doc. 80 at 8. At that time, "all assets/liabilities of [MAA] passed to Walaa in the merger." *Id.* Walaa is, thus, the entity responsible for plaintiffs' insurance policy. *Id.; see also* Rec. Doc. 63.

Co., Ltd. (COOEC). Rec. Doc. 35 at 5. On June 25, 2019, a submarine power cable owned by SAUDI ARAMCO was damaged while COOEC personnel performed demolition and recovery operations in Berri Field. *Id.* SAUDI ARAMCO reported this damage to DISA on September 7, 2019. *Id.* at 6.

Soon after DISA learned of the damage to SAUDI ARAMCO's power cable, the general counsel for Dynamic International, Mark Mahfouz, contacted Marsh KSA to notify them of the cable incident and to request a copy of plaintiffs' insurance policy with MAA. Rec. Doc. 70-1 at 82, 90-91. A Marsh USA representative also contacted Marsh KSA repeatedly to request a copy of Dynamic International's insurance policy with MAA. *Id.* at 85, 89, 91. On November 5, 2019, Marsh KSA informed Dynamic International that MAA would not issue the policy "citing non-submission of regulatory documents." *Id.* at 94. Before MAA would issue a policy, plaintiffs had to now submit a Broker's Letter Authorization on DISA letterhead and a Proposal Form. *Id.* Marsh KSA apologized to Dynamic International and Marsh USA's representative for requesting "these two documents at this stage" as the documents "should have been obtained at the initial stage." *Id.*

DISA signed the Broker's Letter of Authorization in November 2019, despite the letter being back dated to January 1, 2017. *Id.* at 29, 136. This authorization "exclusively appointed" Marsh KSA to act as DISA's "insurance representative and/or broker of record

4

and to communicate on [DISA's] behalf with any insurance company." *Id.* at 136. After plaintiffs submitted the requested Broker's Letter of Authorization and Proposal Form, on November 17, 2019, MAA issued a comprehensive general liability insurance policy to Marsh KSA covering DISA's liability from a back dated period of January 12, 2017 to January 11, 2021. Rec. Doc. 1-2 at 2-3; *see also* Rec. Doc. 45-4 at 49. The policy provides coverage for plaintiffs as well as for "Other Assureds," including DISA's subcontractors for the pipeline project. Rec. Doc. 1-2 at 4.

On March 24, 2020, SAUDI ARAMCO notified DISA that COOEC's demolition operations indeed damaged its cable. Rec. Doc. 35 at 6. This notification came after SAUDI ARAMCO conducted a formal investigation and reviewed contemporaneous video evidence. *Id.* The estimate for repairing the damages is eight million dollars. *Id.* at 11. DISA immediately sent COOEC a letter dated March 26, 2020 requesting that COOEC place its insurance carriers on notice of the damage. *Id.* at 6. On March 31, 2020, COOEC denied all responsibility for damages to the subsea cable. Rec. Doc. 45-4 at 109. Shortly thereafter on April 7, 2020, SAUDI ARAMCO reiterated its request for DISA to submit an action plan for temporary solution and permanent replacement of its damaged cable. Rec. Doc. 35 at 6. Consequently, plaintiffs demanded on April 14, 2020 that COOEC immediately submit an action plan for replacing the damaged

cable and place its underwriters on notice. *Id.* at 7. COOEC's insurers denied any coverage for the damaged cable. *Id.*

As the cable damage took place in the coverage territory and during the policy period of plaintiffs' insurance policy, plaintiffs sought coverage from MAA, now known as Walaa,[2] and formally submitted a claim for the SAUDI ARAMCO cable damage on or around July 1, 2020. Rec. Doc. 70-1 at 162-63; *see also* Rec. Doc. 35 at 10. Walaa denied coverage on September 28, 2020 stating that they were "not in a position to comment on the factual liability" of DISA toward SAUDI ARAMCO and that coverage is provided "on an excess basis while the primary cover shall be with the Insurers issuing the liability policy arranged by COOEC." Rec. Doc. 70-1 at 163. After Walaa denied plaintiffs' claim, Marsh USA, Marsh KSA, and plaintiffs continued to request that Walaa reconsider coverage until on February 12, 2021 plaintiffs sent Walaa a final demand letter for coverage. *Id.* at 179-195, 207.

Walaa still refused to provide DISA with coverage for SAUDI ARAMCO's cable damage, and thus, on April 13, 2021, plaintiffs filed a complaint with this Court against Walaa, Marsh USA, and Marsh & McClennan Companies, Inc. ("MMC"), Marsh USA's parent company.[3] Rec. Doc. 1; *see also* Rec. Doc. 22-1 at 7. On July 6,

---

[2] *See supra* note 1.
[3] Plaintiffs initially named American Life Insurance Company ("ALICO") and AIG MEA Investments and Services Company ("AIG") as additional defendants, but voluntarily dismissed these two defendants on August 23, 2021. Rec. Doc. 64. ALICO and AIG's motions to dismiss were dismissed as moot on November 12, 2021.

2021, plaintiffs filed their first amended complaint alleging that Walaa is liable for losses attributable to SAUDI ARAMCO's cable damage. Rec. Doc. 3 at 12-13. Alternatively, if plaintiffs are not entitled to coverage under the policy, then plaintiffs allege MMC and Marsh USA are liable for their failure to procure coverage that includes liability arising from the cable damage. *Id.* at 13. MMC filed a motion to dismiss on June 10, 2021 for failure to state a claim and for lack of subject matter jurisdiction. Rec. Doc. 22. It then supplemented that motion on August 6, 2021 claiming the Court also lacked personal jurisdiction over MMC. Rec. Doc. 56. On August 2, 2021, Walaa filed a motion to dismiss for lack of subject matter and personal jurisdiction and a motion to dismiss for *forum non conveniens*. Rec. Docs. 44, 45.[4] Marsh USA filed a motion to dismiss for failure to state a claim and lack of personal and subject matter jurisdiction on September 21, 2021. Rec. Doc. 79.

## II.  LAW AND ANALYSIS

### A. Rule 12(b)(1) Standard

Federal courts have limited jurisdiction and cannot adjudicate claims unless the authority to do so is conferred by statutory or constitutional power. *Home Builders Ass'n of Miss. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). Thus, federal courts must dismiss lawsuits whenever it appears they lack

---

Rec. Doc. 98. Plaintiffs initially also sued MAA, but MAA no longer exists as it merged with Walaa on March 1, 2020. *See supra* note 1.

[4] Walaa's pending motions will be addressed in a separate written ruling.

subject matter jurisdiction. *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). District courts considering whether subject matter jurisdiction exists may evaluate: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The plaintiff "constantly bears the burden of proof" that subject matter jurisdiction exists. *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). When considered in conjunction with other Rule 12 motions, attacks on subject matter jurisdiction should be considered before addressing attacks on the merits. *Id.* (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)). Ultimately, a motion to dismiss for lack of subject matter jurisdiction "should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders*, 143 F.3d at 1010.

**B. Rule 12(b)(2) Standard**

Before a defendant must answer to a court "with which he has established no meaningful contacts, ties, or relations," the Due Process Clause requires a "fair warning that a particular activity may subject [the party] to the jurisdiction of a foreign

sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985). The Due Process Clause's "fair warning" requirement "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.* at 472 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Minimum contacts can be satisfied through specific personal jurisdiction or general personal jurisdiction." *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). "A court has general jurisdiction over a corporate defendant where the corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State, the paradigm examples of which are the corporation's place of incorporation and principal place of business." *Diece-Lisa Indus., Inc. v. Disney Enters., Inc.*, 943 F.3d 239, 250 (5th Cir. 2019) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)) (internal quotation marks omitted). Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum." *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). "A federal court may satisfy the constitutional requirements for specific jurisdiction by a showing that the defendant has minimum contacts with the forum state such that

imposing a judgment would not offend traditional notions of fair play and substantial justice." *Luv n' care, Ltd. v. Insta-Mix, Inc.,* 438 F.3d 465, 469 (5th Cir. 2006) (citing *Int'l Shoe Co. v. Wash. Off. of Unemployment Comp. & Placement,* 326 U.S. 310, 316 (1945)) (internal quotation marks omitted).

The Fifth Circuit consolidated the personal jurisdiction inquiry into a three-step analysis:

> (1) whether the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Id.* A forum state may create additional jurisdictional restrictions by statute, which bind the federal courts. However, Louisiana's so-called "long-arm" statute extends jurisdiction to the constitutional limits of due process, causing the inquiries here to fold into one. *Id.* (citing LA. STAT. ANN. § 13:3201(B)).

Where a defendant challenges personal jurisdiction, the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists. *Wyatt v. Kaplan,* 686 F.2d 276, 280 (5th Cir. 1982). The plaintiff need not, however, establish jurisdiction by a preponderance of the evidence; a *prima facie* showing suffices. *Id.* The court must accept as true plaintiffs' uncontroverted, non-conclusory factual allegations and

resolve all controverted allegations in their favor. *Diece-Lisa Indus.*, 943 F.3d at 249.

### C. Rule 12(b)(6) Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint "must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 556 U.S. at 556).

When deciding whether a plaintiff has met its burden, a court "accept[s] all well-pleaded factual allegations as true and interpret[s] the complaint in the light most favorable to the plaintiff, but '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements' cannot establish facial plausibility." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 520 (5th Cir. 2016) (quoting *Iqbal*,

556 U.S. at 678) (some internal citations and quotation marks omitted). Plaintiffs must "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### D. Federal Subject Matter Jurisdiction

Plaintiff's amended complaint asserts federal subject matter jurisdiction under 28 U.S.C. § 1332(a)(3).[5] Rec. Doc. 35 at 3-4. Section 1332(a)(3) confers jurisdiction on federal courts where the amount in controversy exceeds $75,000 and there is a civil action between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." 28 U.S.C. § 1332(a)(3). This statute has "the effect of retaining federal jurisdiction when there is complete diversity between the United States citizens involved in an action but there are foreign subjects among the parties on both sides." *Goar v. Compania Peruana de Vapores*, 688 F.2d 417, 420 n.6 (5th Cir. 1982). *See also Dresser Indus., Inc. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 498 (3rd Cir. 1997); *Transure, Inc. v. Marsh and McLennan, Inc.*, 766 F.2d 1297, 1298-99 (9th Cir. 1985); *Tango Music, LLC v. DeadQuick Music, Inc.*, 348 F.3d 244, 245 (7th Cir. 2003); *Molinos*

---

[5] Plaintiff also alleges this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333. Rec. Doc. 35 at 3. However, after MMC disputed the basis for this jurisdiction, plaintiff effectively conceded that this Court does not have admiralty jurisdiction over MMC. *See* Rec. Doc. 65 at 10 ("[T]he argument raised by Marsh with respect to this Court's admiralty jurisdiction is moot, as Plaintiffs have asserted an additional basis for subject matter jurisdiction in their First Amended Complaint – diversity of citizenship jurisdiction."); *see also* Rec. Doc. 22 at 4-6. Accordingly, the Court does not address whether admiralty jurisdiction applies and only analyzes whether § 1332(a)(3) allows for federal subject matter jurisdiction in this case.

*Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1340 (11th Cir. 2011).[6] However, to retain federal jurisdiction there must be a "legitimate dispute" between the United States citizens involved. *Dresser Indus.*, 106 F.3d at 500; *Transure*, 766 F.2d at 1299; *Bank of N.Y. v. Bank of Am.*, 861 F. Supp. 225, 228 (S.D.N.Y. 1994). The United States citizens need not be "principal adverse parties" so long as their dispute is "legitimate." *Dresser Indus.*, 106 F.3d at 500.

The parties do not dispute that the amount of controversy in this case exceeds $75,000. Rec. Doc. 84 at 16. Nor do the parties dispute that this Court has jurisdiction over matters where the parties are diverse citizens and in which citizens of a foreign state are additional parties. *Id.* at 14-16; Rec. Doc. 79-1 at 9-11; Rec. Doc. 56 at 6-8. Marsh USA and MMC argue, however, that the Court lacks subject matter jurisdiction because there is no legitimate dispute between the diverse United States citizens present in this case. Rec. Doc. 56 at 7; Rec. Doc. 79-1 at 10. The Court finds there is a legitimate dispute between the diverse United States citizens, and therefore, federal subject matter jurisdiction exists.

---

[6] To the Court's knowledge, the Fifth Circuit has not addressed whether federal courts have jurisdiction over cases between diverse United States citizens and additional alien parties since its decision in *Goar*. As such, the Court relies on decisions from other circuits, which often quote *Goar*, to bolster its analysis.

A legitimate dispute is absent when the parties named are "not genuinely involved" in the dispute. *Bank of N.Y.*, 861 F. Supp. at 229. Parties "consistently involved in the disputed transaction" are "legitimate parties to the underlying controversy." *Id.* Section 1332(a)(3) does not demand "a weighing requirement;" rather, "the jurisdictional hook upon which the case hangs" is merely the existence of a legitimate controversy between diverse citizens. *Dresser Indus.*, 106 F.3d at 500. Additionally, when a party retains no rights to individually pursue a claim, the party is not a real party in interest, and thus, is not part of a legitimate dispute. *See Luftahrtversicherungs-Aktiengesellschaft v. Markel Ins. Co.*, No. 06-61184 CV, 2007 WL 141154, at *3 (S.D. Fla. Jan. 16, 2007); *Grand Panama Int'l, Ltd. v. Hacienda Santamonica, S.A.*, No. 10-91172CIV-DIMITROULEAS, 2011 WL 13227888, at *4 (S.D. Fla. Mar. 14, 2011).

At minimum, there is a legitimate dispute between Marsh USA and Dynamic International. Marsh USA is a Delaware corporation with its principal place of business in New York. Rec. Doc. 35 at 2-3. Dynamic International is a limited liability company whose only member is a corporation organized under Louisiana laws with its principal place of business in Louisiana. *Id.* at 2. Consequently, Marsh USA and Dynamic International are parties with

diverse citizenship.[7] *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008) (finding the citizenship of an LLC is determined by the citizenship of all of its members).

Plaintiffs claim there is a legitimate controversy with Marsh USA because if there is no coverage under its insurance policy with Walaa, then Marsh USA is liable to plaintiffs for damage caused by its failure to procure the requested coverage. Rec. Doc. 35 at 13. Plaintiffs provide email exchanges between Dynamic International, Marsh USA, and Marsh KSA and invoices to bolster this allegation. *See, e.g.*, Rec. Doc. 84-1 at 7-11, 18-24, 28-44, 218-19; *see also Ramming*, 281 F.3d at 161 (considering facts outside the complaint in determining subject matter jurisdiction). Although it seems that Marsh KSA, a non-named party, was instrumental in procuring the insurance policy at issue, Marsh USA too was involved. *See* Rec. Doc. 84-1 at 7-11, 18-24, 28-44, 218-19. Marsh USA representatives were engaged from at least January 2017 to January 2021 in coordinating insurance procurement for plaintiffs' project with SAUDI ARAMCO, and plaintiffs paid Marsh USA at least $25,000 to do so. *Id.; see also* Rec. Doc. 84 at 4. Moreover, it was Dynamic International representatives, not DISA's, who coordinated insurance procurement. Rec. Doc. 84-1 at 7-11, 18-24, 28-44, 218-19. The Court does not suggest that

---

[7] MMC is also diverse from plaintiffs as it is a Delaware corporation with its principal place of business in New York.

plaintiffs should succeed on their claim against Marsh USA, but at minimum, there appears to be a legitimate dispute between Marsh USA and Dynamic International, diverse United States citizens. *See Bank of N.Y.*, 861 F. Supp. at 229 (finding that parties consistently involved in the disputed transaction are parties to the suit).

Marsh USA and MMC maintain that there is no legitimate dispute between Dynamic or Dynamic International and MMC or Marsh USA because the case involves an insurance policy issued by Walaa, a Saudi Arabian insurance company, brokered by Marsh KSA, a Saudi Arabian insurance agent, for DISA, a Saudi Arabian limited liability company. Rec. Doc. 79-1 at 10. There are indeed multiple Saudi Arabian parties involved in this dispute, but that does not preclude a legitimate dispute from also existing between United States citizens. Plaintiffs' insurance policy specifically names Dynamic International as a principal insured and Dynamic International appears to be the plaintiff primarily responsible for coordinating insurance coverage. *See* Rec. Doc. 1-2 at 4; *see also* Rec. Doc. 84-1 at 7-11, 18-24, 28-44, 218-19. Furthermore, Marsh USA, while perhaps not plaintiffs' "exclusive agent," was hired to procure, or at least consult on, an insurance policy that

is now the subject of this instant dispute. Rec. Doc. 84-1 at 7-11, 18-24. Thus, this Court has subject matter jurisdiction.[8]

## E. Personal Jurisdiction

### 1. Marsh USA

The parties do not dispute whether this Court can exercise personal jurisdiction over Marsh USA. *See* Rec. Doc. 84 at 20. Marsh USA only claims that if plaintiffs had sued Marsh KSA, which they did not, then this Court would lack personal jurisdiction over Marsh KSA. Rec. Doc. 79-1 at 15-18. As Marsh KSA is not a named party in this matter, the Court need not consider whether it lacks personal jurisdiction over that entity. *See* Rec. Doc. 35 at 1-3. The Court may exercise specific personal jurisdiction over Marsh USA because Marsh USA has sufficient minimum contacts with Louisiana. Marsh USA is registered to do business in Louisiana and assisted plaintiffs with procuring insurance coverage for plaintiffs' contract with SAUDI ARAMCO while in Louisiana. *Id.* at 2-3; *see also* Rec. Doc. 65 at 15-16. Furthermore, exercising specific personal jurisdiction over Marsh USA does not offend traditional notions of fair play and substantial justice because it is not apparent that asserting personal jurisdiction in the forum would be unfair or unreasonable. *See* Rec. Doc. 65 at 17; *see*

---

[8] As the Court finds a legitimate dispute between Marsh USA and Dynamic International, two diverse United States citizens, it need not address whether a legitimate dispute exists between MMC and Dynamic International or Dynamic.

*generally* Rec. Docs. 56, 79, 88. Accordingly, this Court may exercise specific personal jurisdiction over Marsh USA.

### 2. MMC

Plaintiffs assert that because this Court has personal jurisdiction over MMC's subsidiary, Marsh USA, MMC is also subject to specific personal jurisdiction in this Court. Rec. Doc. 65 at 17. MMC argues MMC and Marsh USA do not comprise a single business enterprise, and thus, the Court cannot impute Marsh USA's Louisiana contacts to MMC. Rec. Doc. 83 at 6-7. MMC has the better argument.

The mere presence of a parent-subsidiary relationship is not sufficient to warrant jurisdiction over the foreign parent. *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983). However, the "presumption of corporate separateness" may be overcome by clear evidence that a parent so dominates the subsidiary that they do not in reality constitute separate and distinct corporate entities. *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999); *Dalton v. R&W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990). "Clear evidence requires an additional or a plus factor, something beyond the subsidiary's mere presence within the bosom of the corporate family." *Dickson Marine*, 179 F.3d at 338 (internal quotation marks omitted). The following factors determine whether a parent's control exceeds the norm: (1) amount of stock owned by the parent of the subsidiary; (2) whether the two corporations have separate headquarters; (3)

whether the corporations have common officers and directors; (4) whether they observe corporate formalities; (5) whether they maintain separate accounting systems; (6) whether the parent exercises complete authority over general policy; and (7) whether the subsidiary exercises complete authority over daily operations, including research and development, marketing, and supply. *Dalton*, 897 F.2d at 11363 (citing *Hargrave*, 710 F.2d at 1160). The burden of presenting a prima facie showing of corporate relatedness falls on the proponent of the alter ego theory. *Id.*

Here, plaintiffs do not satisfy their burden. Plaintiffs first contend that MMC and Marsh USA are a single business entity because one of MMC's executive officers is also a director of Marsh USA. Rec. Doc. 65 at 20. Next, plaintiffs explain that MMC uses Marsh USA's services to sell a single product. *Id.* Further, they assert that MMC advertises its services to the public as a global leader relying on the joint collective efforts of its wholly-owned subsidiaries and publicizes all of its various subsidiaries as "Marsh Location Sites." *Id.* Additionally, all employees allegedly utilize the "marsh.com" email domain and conduct business by and between various Marsh affiliates. *Id.*

Plaintiffs, however, fail to demonstrate the requisite level of control necessary to find that MMC and Marsh USA are alter egos. One hundred percent ownership of a subsidiary and commonality of officers and directors are alone not sufficient to establish an

alter ego relationship between two corporations. *Hargrave*, 710 F.2d at 1160. And plaintiffs do not provide sufficient facts to show that they meet any of the other five *Hargrave* factors. Plaintiffs do suggest "an unclear allocation of profits and losses between MMC and Marsh, USA" and posit that MMC is dependent on its subsidiaries for dividends and other payments. *Id.* at 20. But these proffers do not amount to MMC and Marsh USA sharing the same accounting system. Consequently, to the extent that plaintiffs show interactions between MMC and Marsh USA, "that is in the nature of a parent-subsidiary relationship." *Admin'rs of Tulane Educ. Fund v. Ipsen, S.A.*, 450 F. App'x 326, 332 (5th Cir. 2011). Plaintiffs do not demonstrate that MMC "possessed and exercised the nature and degree of control over [Marsh USA] necessary to fuse the two corporations together for the purposes of" establishing personal jurisdiction. *Hargrave,* 710 F.2d at 1161.

As plaintiff does not meet its burden of establishing MMC and Marsh USA as alter egos, and plaintiffs do not contest that MMC's own contacts with Louisiana are insufficient for exercise of personal jurisdiction in the Eastern District of Louisiana, the Court finds it lacks personal jurisdiction over MMC. *See* Rec. Doc. 83 at 6.[9]

---

[9] Alternatively, plaintiffs requested permission to conduct jurisdictional discovery on MMC's contacts with the Eastern District of Louisiana. Rec. Doc. 65 at 21. The Court need not address this issue because as described below, it also finds that plaintiffs fail to state a claim. *See infra* Part II.F.

**F. Plaintiffs' Claims Against Marsh USA and MMC Are Perempted**

Plaintiffs allege that MMC and Marsh USA are liable for damages caused by their "failure to procure the requested coverage" and "for any failures to timely and properly place and bind the requested coverage." Rec. Doc. 35 at 13. However, MMC and Marsh USA assert that plaintiffs failed to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure because Louisiana Revised Statute Section 9:5606(A) perempts plaintiffs' allegations. Rec. Doc. 22-1 at 8; Rec. Doc. 79-1 at 12. The Court finds that plaintiffs' claims are indeed perempted.[10]

Section 9:5606(A) provides that:

> [n]o action for damages against any insurance agent, broker, solicitor, or other similar licensee under this state, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide insurance services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered.

LA. STAT. ANN. § 9:5606(A). This statute "requires a plaintiff to file suit against an insurer within one year of the plaintiff's knowledge or constructive knowledge of the act, omission, or neglect that led to the cause of action." *Campbell v. Stone Ins.,*

---

[10] Besides peremption, defendants also assert that plaintiffs fail to state a claim against Marsh USA and MMC because only Marsh KSA could be responsible for any failures to procure a proper insurance policy. Rec. Doc. 79-1 at 8. Even if the Court finds plaintiffs pleaded their claim sufficiently against defendants, plaintiffs' claims would be perempted. Thus, the Court only addresses the peremption issue. *See* Rec. Doc. 22-1 at 6; Rec. Doc. 79-1 at 5.

*Inc.*, 509 F.3d 665, 670 (5th Cir. 2007). "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *TCI Packaging, LLC v. HUB Int'l Midwest Ltd.*, No. 19-10861, 2020 WL 730329, at *5 (E.D. La. Feb. 13, 2020) (quoting *Campo v. Correa*, 2001-2707, p. 12 (La. 6/21/02); 828 So. 2d 502, 510-11).

Under Louisiana law, the insured has a duty to read and know its insurance policy provisions. *Motors Ins. Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199, 205 (5th Cir. 1990). Accordingly, for allegations of failure to procure insurance coverage, "the one-year peremptive period begins to run when the insured receives a copy of the policy." *TCI Packaging*, 2020 WL 730329, at *5; *see also Campbell*, 509 F.3d at 670. There are some instances, however, where an insurance agent can still be held liable, despite the insured filing suit more than a year after receiving its insurance policy. *See, e.g.*, *St. Charles Surgical Hosp. LLC v. HUB Int'l, Ltd.*, No. 20-2094, 2021 WL 1561218, *7 (Apr. 21, 2021); *Jackson v. QBE Specialty Ins. Co.*, No. 17-11730, 2018 WL 3408182, at *8 (E.D. La. July 18, 2018). "Although Louisiana law does not recognize a duty owed by an insurance agent to spontaneously advise a client regarding insurance coverage, an agent may voluntarily assume such a duty. *Id.*; *see also Offshore Prod. Contrs. v. Republic Underwriters Ins. Co.*, 910 F.2d 224, 230 (5th Cir. 1990). In cases where the insured alleges the insurance agent breached a greater

duty to advise and consult with the insured, the peremptive period can begin when the insured realizes its missing coverage. *See Jackson*, 2018 WL 3408182, at *9; *St. Charles Surgical Hosp.*, 2021 WL 1561218, at *7.

Here, the parties dispute when the peremptive period began. MMC and Marsh USA claim that at best, the peremptive period began on November 19, 2019, the date when a Marsh KSA representative emailed a copy of the policy to a Dynamic International representative. Rec. Doc. 35 at 14; *see also* Rec. Doc. 84-1 at 28. Defendants assert that plaintiffs had constructive notice of any failed coverage upon receiving the insurance policy. Rec. Doc. 22-1 at 11-12. Plaintiffs, on the other hand, argue that the peremptive period began on September 28, 2020 when Walaa denied coverage. Rec. Doc. 65 at 19. Plaintiffs explain that they were "lulled into complacency" because "they relied on the expertise and advices of their brokers." *Id.* Thus, they only learned of defendants' "failure to procure the requested coverage" in September 2020. *Id.* Plaintiffs, nevertheless, are unconvincing.

Plaintiffs acknowledge that they received their insurance policy on November 19, 2019 via email. Rec. Doc. 35 at 14; *see* LA. STAT. ANN. § 22:2462(A), (B) (2021) (allowing electronic delivery for insurance documents). The insurance policy explicitly states:

> "[i]f other valid and collectible insurance is available
> to the insured for a loss we cover under Coverages A and

B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance
This insurance is primary except when b. below applies. . . .

b. Excess Insurance
This insurance is excess over: . . .

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages A or B to defend you against any suit if any other insurer has a duty to defend you against that suit. If no insurer defends, we will undertake to do so, but we will be entitled to your rights against all those other insurers.

Rec. Doc. 1-2 at 24. When Walaa denied plaintiffs coverage on September 28, 2020, they noted that according to "the terms of the Metlife Insurance Policy," the coverage is "on an excess basis while the primary cover shall be with the Insurers issuing the liability policy arranged by COOEC," plaintiffs' subcontractor. Rec. Doc. 84-1 at 164. "[T]he Subcontractor's insurances shall act as the primary insurance and the Contractor's insurances shall be the excess policy." *Id.* at 165.[11] Plaintiffs allege that MMC and Marsh USA "never advised Plaintiffs that the Policy procured was

---

[11] The Court considers plaintiff's exhibit here because Marsh USA incorporates it into its briefing and plaintiffs' complaint states that the policy procured was an excess insurance policy. Rec. Doc. 83 at 4; Rec. Doc. 35 at 14. *See also Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)).

an excess policy that would not provide primary coverage in the event of a loss." Rec. Doc. 35 at 14. But plaintiffs had constructive knowledge of the primary insurance and excess insurance provisions when they received the policy on November 19, 2019, which stated them clearly. *See Campbell*, 509 F.3d at 671-72 (finding that when the cover letter and flood rejection form acknowledged flood coverage exclusion, then the insured had constructive notice of the exclusion upon receiving those documents); *Ruiz*, 295 F. App'x at 672 (concluding that where the policy contained unambiguous flood exclusion and brochure advertising separate flood insurance, insured should have known that the policy obtained did not cover flood damage); *TCI Packaging*, 2020 WL 730329, at *6 (holding that when the policy "contains straightforward, uncomplicated, exclusions," then the insured had constructive notice of the coverage limitations upon receiving the policy); *P&P Pizza, LLC v. Landry Harris & Co.*, No. 08-5175, 2009 WL 2160098, at * 4 (E.D. La. July 17, 2009) (finding that when a cursory glance over the policy yields a coverage discrepancy, then the insured had constructive notice upon receiving the policy). Additionally, when plaintiffs received their policy, they already knew of the damage to SAUDI ARAMCO's pipelines, and thus, could have even further recognized that the insurance policy would only apply to the particular incident as

excess coverage. *See* Rec. Doc. 35 at 6 (alleging that SAUDI ARAMCO informed plaintiffs of pipeline damage on September 7, 2019).

As such, the peremptive period under Section 9:5606(A) began on November 19, 2019[12] and when plaintiffs filed their complaint on April 13, 2021, the one-year peremptive period had already run.[13]

Plaintiffs, however, maintain that the peremptive period should not begin upon their receipt of the insurance policy. Rec. Doc. 84 at 18-19. They acknowledge that they "had the opportunity to review the Policy upon receipt in order to discover any issues in coverage," but argue there are some exceptions to the general rule that the Section 9:5606 peremptive period "begins to run when the insured receives a copy of the policy." *Id.* Although there are some exceptions, they are not applicable here. Plaintiff relies on three cases from the Eastern District of Louisiana to argue that plaintiffs depended on MMC and Marsh USA's expertise and advice of, and thus, did not have constructive knowledge of defendants' failure to procure the requested coverage until Walaa denied coverage. *Id.; see also Romero v. Travelers Indem. Co. of Conn.,*

---

[12] Arguably, the peremptive period could have began on November 17, 2019, when Walaa, then MAA, issued its insurance policy to Marsh KSA, DISA's acknowledged insurance broker. *See* Rec. Doc. 84-1 at 136 (stating that DISA "exclusively appointed" Marsh KSA to act as their insurance broker); *see also Campbell*, 509 F.3d at 672. But regardless, as plaintiffs filed their suit five months after the one-year peremptive period, Section 9:5606(A) still bars plaintiffs' claims.
[13] Plaintiffs also claim that defendants failed to timely and properly place and bind the requested insurance. Rec. Doc. 35 at 13. The peremptive period for that claim almost certainly began in November 2019 when plaintiffs realized Walaa never issued them a policy. Rec. Doc. 84-1 at 82-98.

No. 06-7471, 2006 WL 3692773 (E.D. La. Dec. 12, 2006); *S. Athletic Club, LLC v. Hanover Ins. Co.*, No. 06-2605, 2006 WL 2583406 (E.D. La. Sept. 6, 2006); *Hoffman v. All. Ins. Agency Servs., Inc.*, No. 06-11425, 2007 WL 2088373 (E.D. La. July 19, 2007).

These three cases, however, are all distinct from the instant dispute. Preliminarily, the Court decided all three before the Fifth Circuit affirmed in *Campbell* that when an "insurance agent's alleged failures relate to procurement of the policy . . . the peremptive period commences upon the policy's issuance." 509 F.3d at 670-72. Moreover, all three cases involve policies where the courts grappled with whether the peremptive period began when the policy was initially issued or when a renewal was issued. *Romero*, 2006 WL 3692773, at *3; *S. Athletic Club, LLC*, 2006 WL 2583406, at *2-3; *Hoffman, Inc.*, 2007 WL 2088373, at *2. These facts are not applicable here as plaintiffs' insurance policy did not involve any renewals. *See generally* Rec. Doc. 35.

Plaintiffs, however, fixate on the idea that defendants' representations as experts in insurance procurement lulled them into complacency. Rec. Doc. 84 at 19. As such, plaintiffs are supposedly "excused from its failure to discover the problem earlier." *Romero*, 2006 WL 3692773, at *3; *see* Rec. Doc. 84 at 19. Although plaintiffs may have relied on Marsh USA and MMC's "expertise and advices," they do not specifically "allege that the insurance agent carried a greater duty to advise and consult with

the insured." *See* Rec. Doc. 84 at 19; *St. Charles Surgical Hosp.*, 2021 WL 1561218, at *6; *see also Jackson*, 2018 WL 3408182, at *9 (finding a peremptive period began two months after the insured received their policy because plaintiff alleged insurance agent "breach an assumed duty to review the application with plaintiffs").[14] If they had, then perhaps plaintiffs would have a better argument that the peremptive period "commenced once the client discovered the insurer's failure to advise." *See St. Charles Surgical Hosp.*, 2021 WL 1561218, at *7. Instead, plaintiffs allege that defendants failed to "procure the requested coverage," "failed to timely and properly place and bind the requested insurance," and "breached their duties of due diligence to procure the insurance requested." Rec. Doc. 35 at 13-14. When the insured's allegations focus on a failure "to obtain the coverage requested," as here, then the *Campbell* and *Ruiz* standard applies. *See Oddo v. Am. Heritage Life Ins. Co.*, 2013 WL 679112, at *4-5; *see also Ruiz*, 295 F. App'x at 672; *Campbell*, 509 F.3d at 671-72. That standard provides that when an insurance policy clearly states a provision or exclusion, the insured has constructive notice of that provision, and the peremptive period under Section 9:5606 begins

---

[14] Plaintiffs do allege that "[MMC] and Marsh USA never advised Plaintiffs that the Policy procured was an excess policy that would not provide primary coverage in the event of a loss," but that claim does not seem to equate to the allegations discussed in *St. Charles Surgical Hospital* or *Jackson*. Rec. Doc. 35 at 14; *see St. Charles Surgical Hosp.*, 2021 WL 1561218, at *6; *Jackson*, 2018 WL 3408182, at *9.

on the day the insured receives its policy. *See Ruiz,* 295 F. App'x at 672; *Campbell*, 509 F.3d at 671-72.[15] Thus, the peremptive period for plaintiffs' claims began on November 19, 2019, and consequently, they were time barred when plaintiffs filed suit on April 13, 2021.

New Orleans, Louisiana this 16th day of December, 2021

_____

SENIOR UNITED STATES DISTRICT JUDGE

---

[15] Interestingly, plaintiffs were instructed by Marsh USA and separately by Marsh KSA to review the policy's terms and conditions and notify the latter entities with any discrepancy or need for changes in November 2017 and November 2019, respectively. Rec. Doc. 84-1, pp. 23-24 and 28.  The record does not reflect that any such review or notification of discrepancies was done by plaintiffs until after the denial of primary coverage by the insurer.